UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

|  |  |  |
|---|---|---|
| ACES HIGH COAL SALES, Inc., *et al.*, | ) | |
| | ) | |
| | ) | No. 6:15-CV-161-DLB-HAI |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMUNITY BANK & TRUST OF | ) | MEMORANDUM OPINION AND |
| WEST GEORGIA, *et al.*, | ) | ORDER |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

After receiving a demand letter asserting a lien in some coal that Plaintiffs processed, Plaintiffs responded by filing this lawsuit. They assert civil RICO claims, a claim for declaratory relief, and various state tort claims. The Defendants, various coal companies, individuals, a bank and its counsel, have moved to dismiss. After fully reviewing the record, the Court finds dismissal is appropriate because the RICO claims are insufficiently pled and the Court declines to exercise jurisdiction over the remaining claims.

By agreement of the parties, certain motions to dismiss have been referred to the undersigned for final disposition. D.E. 160. Plaintiffs Aces High Coal Sales and Wendell Elza, sales manager for Aces High, initiated this lawsuit on September 11, 2015. D.E. 1. Plaintiffs have filed a Second Amended Complaint[1] ("SAC") (D.E. 111) that is subject to four motions to dismiss. D.E. 117, 118, 119, 121. Intervening Plaintiffs Mike Trimble and Trimble Coal Sales

---

[1] Because "[a]n amended complaint supersedes an earlier complaint for all purposes," *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 589 (6th Cir. 2013), the Court will focus its attention solely on the SAC.

filed a complaint for a declaratory judgment on December 31, 2015.  D.E. 62.  That complaint is subject to three motions to dismiss.  D.E. 124, 125, 128.  Each of these seven motions to dismiss has been fully briefed.  Plaintiffs and Intervening Plaintiffs have filed motions for the Court to entertain oral arguments.  D.E. 155, 156.  Plaintiffs have also moved to initiate limited discovery. D.E. 163.

Defendants fall into four groups, defined as follows throughout this Order:

- Peters Defendants – Michael Peters and his two companies, Taylor Rose and Bransen Energy.

- Tomlin Defendants – Kyle Tomlin and his company Riverside.

- Bank Defendants – Community Bank & Trust – West Georgia ("CB&T") and its president William R. Stump.

- Troutman Sanders ("TS") Defendants – the law firm Troutman Sanders and attorney Michael E. Johnson.

The Intervening Plaintiffs are Mike Trimble and Trimble Coal Sales.

## I.

This lawsuit arose in response to a letter that attorney Michael Johnson of Troutman Sanders (on behalf of CB&T) sent to J.D. Johnson, attorney for Plaintiffs, in August 2015.  D.E. 1-1 at 2-4.  The letter asserted that the bank (CB&T) held a security interest in coal that was unlawfully taken from Taylor Rose by Elza without the bank's consent.  The letter also claimed that Elza and Aces High were civilly and criminally liable for taking the coal, and demanded immediate payment of the fair market value of the coal, which was estimated to be $6,375,000. Otherwise, "the Bank [would] seek all available remedies."  The letter ended by noting that it

was "written with a view towards the compromise of disputed claims," and asked for a response. *Id.*

Michael Johnson also sent letters to two of Aces High's downstream customers, one of which is in the record ("the Kolmar letter").  D.E. 1-2.  The Kolmar letter asked Kolmar Americas to contact Troutman Sanders "and provide information about the purchase of cannel coal from Aces High."  *Id.*  It warned that the bank was "prepared and willing to pursue all options available to protect its rights."  *Id.*

The SAC alleges ten counts.  D.E. 111 at 47-59.  The first count seeks a declaratory judgment that Plaintiffs' actions were legal, along with orders that (1) restrain Defendants from seeking to collect debts from Plaintiffs and from interfering with Plaintiffs' business relations, and (2) compel Defendants to retract their "false and libelous statements" found in the demand letters.  *Id.* ¶¶ 233-250.  Plaintiffs name all Defendants in this count.

The second count alleges racketeering under 18 U.S.C. § 1962(c).  *Id.* ¶¶ 251-60.  Peters Defendants and Tomlin Defendants are named in this count, although the SAC accuses the Bank Defendants and TS Defendants of joining the conspiracy.  *See, e.g.*, *id.* ¶ 268.

The third count alleges racketeering under 18 U.S.C. § 1962(b).  *Id.* ¶¶ 261-64.  It names Peters Defendants and Tomlin Defendants.

The fourth count alleges racketeering under 18 U.S.C. § 1962(d).  *Id.* ¶¶ 265-69.  This count names all Defendants.

The fifth count alleges libel *per se*.  *Id.* ¶¶ 270-73.  It is against the Bank Defendants and TS Defendants.

The sixth count alleges Tortious Interference with Prospective Economic Advantage.  *Id.* ¶¶ 274-76.  It is against CB&T and TS Defendants.

The seventh count alleges fraud against the Peters Defendants and Tomlin Defendants. *Id*. ¶¶ 277-80.

The eighth count alleges unjust enrichment against CB&T.  *Id*. ¶¶ 281-88.

The ninth count names CB&T and seeks imposition of a constructive trust in favor of Aces High.  *Id*. ¶¶ 289-91.

The tenth count alleges civil conspiracy against "all the defendants."  *Id*. ¶¶ 292-94.

The intervening complaint seeks a declaratory judgment and an injunction against Defendants, plus costs.  D.E. 62 at 20-23.  It names all defendants.  *Id*. at Wherefore Clause.

The following is a brief summary of the facts alleged in the SAC.  The story begins "around the end of 2010 or early 2011," when Elza of Aces High was introduced to Peters of Bransen Energy and Taylor Rose through a mutual acquaintance, Mike Trimble of Trimble Coal Sales (the Intervening Plaintiffs).  Peters had a contract to supply coal to an electric utility named Dominion.  He hired Elza/Aces High to deliver the coal.  The SAC alleges that Peters Defendants defrauded Dominion by mixing "Coke Breeze" into the coal.  Dominion eventually sued Bransen Energy in another judicial district for breach of contract and won partial summary judgment.

The meat of the case in this Court revolves around a pile of low-quality "cannel coal" that Peters Defendants were storing in West Virginia.  Peters wanted to sell the coal to Ireland as briquettes for home heating units, but the Irish government rejected the briquettes.  According to the SAC, Peters then decided to sell the coal domestically.  Aces High (in conjunction with Trimble) was to prepare, load, and ship the coal to buyers.  In January 2015, Peters, who was in debt to Aces High, struck a deal whereby he could pay off his debt by hiring Aces High to work a series of cannel sales to Eagle Coal Sales.  Eagle in turn sold the coal to Kolmar in West

4

Virginia and Noble Energy in Kentucky.  Aces High worked on the Eagle deal at the West Virginia cannel coal site until April 16, 2015.  The problem with these sales was that the coal pile was allegedly subject to a lien as collateral to a $9 million dollar loan that CB&T made to Taylor Rose in July 2014.  On August 21, 2015, CB&T, through its attorney at Troutman Sanders, sent the three demand letters that instigated this case by demanding payment for the allegedly secured coal that was sold without the bank's authorization.

## II.

Rule 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon with relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In reviewing a Rule 12(b)(6) motion, the Court accepts all the plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff.  *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).  For a claim to be viable, the complaint must go beyond labels and conclusions and formulaic recitations of the elements of a cause of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, and must "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984).

## III.

Plaintiffs allege claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.  SAC ¶ 18.  Under the "Civil RICO" statute, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may

sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(b). Plaintiffs allege civil RICO violations under three subsections: § 1962(b) (taking control of an enterprise through a pattern of racketeering activity); § 1962(c) (conducting an enterprise's affairs through a pattern of racketeering activity); and §1962(d) (here, conspiring to violate subsections (b) and (c)). *Id.* ¶¶ 251-69.

## A. Section 1962(c)

Section 1962(c), the basis of Count Two, makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." *See* SAC ¶¶ 251-60. The elements are the (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Wallace v. Midwest Fin. & Mortgage Servs., Inc.*, 714 F.3d 414, 422 (6th Cir. 2013) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). "[P]articipation in the conduct of an enterprise's affairs requires proof that the defendant participated in the 'operation or management' of the enterprise." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).

Plaintiffs allege the existence of an enterprise. According to the SAC, "Defendants Peters, Bransen Energy, Taylor Rose, and the Tomlin Defendants (collectively the 'Peters Association') are an association-in-fact which, thus, constitutes an 'enterprise' which affected interstate commerce, within the meaning of 18 U.S.C. § 1961(4)." SAC ¶ 252. Plaintiffs allege that Peters and Tomlin have participated in the "activities" of the enterprise. *Id.* ¶ 256. They have also alleged various acts of racketeering activity, which will be discussed in more detail

below.  Regardless of whether Plaintiffs satisfy the other elements of a civil RICO claim, they have failed to properly plead a "pattern" of racketeering activity.  The Court will dismiss Plaintiffs' § 1962(c) action under Rule 12(b)(6) based on their failure to adequately plead the pattern element, without deciding whether any other element was properly pleaded.

Predicate acts of racketeering activity are acts that would be "indictable" as one of the federal crimes enumerated in § 1961(1).  Plaintiffs claim Defendants committed various acts of mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; and financial institution fraud, 18 U.S.C. § 1344.  The heightened pleading standards for fraud under Federal Rule of Civil Procedure 9(b) apply to the alleged predicate crimes underlying a civil RICO claim.  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012); *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988); *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987).  According to Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "[T]o satisfy Rule 9(b), a plaintiff must (1) specify the time, place, and content of the alleged misrepresentation, (2) identify the fraudulent scheme and the fraudulent intent of the defendant, and (3) describe the injury resulting from the fraud."  *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 751 (6th Cir. 2014).  For the sake of this analysis, the Court will assume, without deciding, that each predicate fraud is properly pleaded under Rule 9(b).

The alleged predicate frauds occur in two clusters or schemes.  The first scheme occurred when Peters cheated Dominion by adding Coke Breeze to coal in 2011-2012.[2]  SAC ¶¶ 32-48.

The second scheme occurred when Peters allegedly scammed Plaintiffs out of money and then created the cannel coal deal to set Plaintiffs up as scapegoats in order to extort money to pay

---

[2] In paragraphs 37, 41, 43, and 44, Plaintiffs allege violations of 18 U.S.C. §§ 1941 and 1943, statutes that do not exist.  The Court understands these to be references to §§ 1341 and 1343.

down his company's $9 million loan from CB&T.  At first, from 2010 to 2014, Elza and Peters were "friends" who "engaged in a large volume of business" because Peters "had significant contacts within the power industry."  SAC ¶ 27.  Peters was "highly connected, reliable and trustworthy."  *Id*. ¶ 29.  But then, according to the SAC, Elza went from friend to victim.  It happened in conjunction with the loan from CB&T to Taylor Rose, which occurred on July 24, 2014.  *Id*. ¶ 66.  After that, Plaintiffs started working the West Virginia coal and in January 2015 struck the deal whereby Peters could pay off his debts.  Whence came these debts?  The SAC alleges Peters wronged Plaintiffs in several ways that left him owing them money:

- Peters did not deliver to Aces High coal valued at **$189,608.40** in the early stages of the West Virginia coal sales.  SAC ¶ 88.

- Aces High loaded coal onto barges for Bransen Energy, and Bransen failed to pay for eight barges' worth on the fraudulent basis that Bransen's downstream purchaser had not paid for the coal—a total shortfall of **$364,476.**  These shipments occurred in July 2014, but the unpaid invoices were issued in December 2014.  *Id*. ¶¶ 89-90.

- Peters fraudulently induced Aces High to wire Bransen Energy $545,000 for a trainload of coal, for which Peters promised to repay **$570,000** within two weeks, funds that were not paid.  *Id*. ¶ 91.  This occurred in "late 2014."  *Id*.

- Peters fraudulently induced Aces High to wire $279,000 to CB&T for Peters to buy a bond that promised to render an immediate profit.  Peters promised to pay Aces High **$300,000** within five days, but he never did.  *Id*. ¶¶ 92-96.  This occurred in January 2015.  *Id*. ¶ 92.

These amounts allegedly owed by Peters to Plaintiffs total approximately $1.4 million.

Plaintiffs cast the last three of these transactions as predicate crimes of mail, wire, or bank fraud underlying their civil RICO claims.  SAC ¶¶ 90, 91, 93-96.  Following these transactions, Peters "stopped all communications with the plaintiffs after January 18, 2015."  *Id.* ¶ 100.  However, communicating through Intervening Plaintif Trimble as an intermediary, Peters and Plaintiffs struck up a deal whereby Plaintiffs could recoup the $1.4 million that Peters owed them by participating in the cannel coal sales.  *Id.* ¶ 105.  The deal involved selling "a large volume of the cannel coal to an entity known as Eagle Coal Sales," which in turn sold the coal to Kolmar Americas and Noble Energy.  *Id.* ¶¶ 105-106.  Under the deal with Peters, "Aces High would be paid for its services in loading and screening the coal to be sold by [Trimble Coal Sales] in lieu of being repaid its [$1.4 million] debt by Peters and his entities."  *Id.* ¶105.  The deal was cemented on January 29, 2015, when Peters approved the deal in a text to Trimble that asserted, "I own the whole pile."  *Id.* ¶ 108.  Ultimately, "The last load of coal screened and loaded by Aces High left the site on April 16, 2015, after Aces High earned back the amounts unpaid by Peters, Bransen Energy and Taylor Rose, together with repayment of its costs associated with screening and loading the cannel coal."  *Id.* ¶ 124.

Plaintiffs allege that this cannel coal deal was itself a fraudulent scheme that included several underlying predicate frauds.  SAC ¶ 108.  The core aspect of the alleged scheme was to sell bank-secured coal through Aces High in order to frame Aces High for conversion and then extort Aces High (and Kolmar and Noble Energy) through the bank's legal demands.  *Id.* ¶ 135.  CB&T's purported motivation in joining the conspiracy was to avoid a default on its loan to Taylor Rose because its collateral was insufficient and the United States Department of Agriculture ("U.S.D.A."), which backed the loan, could have voided its guaranty, jeopardizing CB&T's continued viability.  *Id.*  Assuming (without deciding) that each of these predicate

frauds is properly pleaded, Plaintiffs' RICO claim fails because the frauds do not establish a pattern of racketeering activity.

At a bare statutory minimum, a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C.A. § 1961(5).  Case law further requires that a "pattern of racketeering activity" have a relationship among the predicate acts, plus continuity. *See Heinrich*, 668 F.3d at 409-10.  Continuity requires Plaintiffs to adequately plead "either a 'close-ended' pattern (a series of related predicate acts extending over a substantial period of time) or an 'open-ended' pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed)."  *Id*.

"The relationship requirement is satisfied by showing the predicate acts have 'similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Heinrich*, 668 F.3d at 409 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).  For example, in *Heinrich*, this prong was satisfied when the predicate acts were committed by the same participants for similar purposes with similar victims using similar methods of commission (in that case, a website designed to defraud potential adoptive parents).  *Id*.  Plaintiffs fail the relationship-plus-continuity test.

### 1.  The Dominion Fraud is Insufficiently Related

Crucial to their RICO claim is Plaintiffs' allegation that Peters's 2011-2012 conduct with Dominion concerning the Coke Breeze counts as a predicate crime.  *See* SAC ¶¶ 30-49.  As explored in the next section, if this conduct is not sufficiently related to the core alleged

racketeering activity (the cannel coal scheme), the activity did not continue long enough to support a RICO claim.

The case of *Vild v. Visconsi* is instructive regarding the relationship test.  In that case, the RICO plaintiff attempted to show a pattern of racketeering activity by weaving his own injuries together with injuries suffered by another group.  The defendants' alleged acts against the plaintiff were instances of mail and wire fraud designed to induce him into a real estate marketing agreement.  *Vild v. Visconsi*, 956 F.2d 560, 566 (6th Cir. 1992).  The complaint also alleged other predicate acts "separate and distinct from the previously described scheme to defraud and extort the plaintiff[,]" but which concerned, in part, the same real estate development.  *Id*. at 563.  These involved wire fraud communications designed to induce customers to purchase real estate interests from the defendants.  *Id*.  In affirming the district court's dismissal of the RICO claim, the appellate court found that "[e]ven if the predicates within each of the two types of conduct may be somehow interrelated, the two types of alleged conduct are not related within the meaning of RICO."  *Id*. at 566.

Applying the standard from *H.J., Inc.*, the court first found that the two schemes had "separate and unrelated purposes":

> According to the plaintiff's third amended complaint, the defendants' conduct directed toward him had two purposes—to induce him to sign the marketing agreement and then to force him out of business.  The other alleged conduct was directed at ultimate purchasers of the real estate interests.  This conduct, violations of laws governing direct mail solicitation and the use of certain illegal contracts in Florida, had, in our view, separate and unrelated purposes.  In the case of the direct mail solicitations, the defendants' purpose was to sell real estate interests to purchasers without the use of middlemen such as the plaintiff and to gain a marketing advantage with persons and entities beside plaintiff.  None of this conduct had a similar or related purpose of inducing the plaintiff to make a contract with defendants or forcing the plaintiff out of business.

*Vild*, 956 F.2d at 566.

11

Second, the two types of conduct had "disparate results." *Id*.

> The first line of activities resulted in the plaintiff's association with the defendants in a marketing agreement and the eventual demise of the business venture. The second line of conduct was directed toward ultimate purchasers and resulted in unspecified individuals attending sales meetings and perhaps acquiring real estate interests [in the development or some] venture of defendants.

*Id*.

Third, the two types of conduct were "directed at different victims." *Vild*, 956 F.2d at 566. "The plaintiff was the *only victim* of the threats, extortion and fraud perpetrated with regard to the failed marketing agreement." *Id*. at 566-67. The court explained:

> The plaintiff was never an ultimate purchaser of real estate interests . . . . He cannot complain about harm to these other persons or any state agency. . . . We do not hold that a civil RICO plaintiff must necessarily be directly harmed by all the alleged predicate acts, because harm from one enumerated violation may, in certain situations, be sufficiently connected. Our conclusion merely reflects that this plaintiff, under the circumstances of this case, may not use unrelated predicate acts that allegedly may have harmed ultimate purchasers or other third parties not similarly situated to the plaintiff.

*Id*. at 567.

Fourth, the court found that the methods of committing the schemes were different. While the scheme against the plaintiff was accomplished through "extortion, threats, wire and mail fraud," the fraudulent scheme against the purchasers essentially entailed violations of consumer protection laws that "would not necessarily preclude purchasers from enforcing contract rights." *Vild*, 956 F.2d at 567. Significantly, the court explained, "A mere allegation that the defendants used wire and mail fraud in two otherwise dissimilar schemes does not, under the circumstances, satisfy the relationship prong of the pattern test." *Id*.

The court concluded that the second group of allegations "simply did not harm, nor threaten to harm, the plaintiff." *Vild*, 956 F.2d at 569. And, "[t]o form a pattern, all predicate actions must have a relationship to one another." *Id*. at 570.

> Plaintiff may not complain about conduct which did not harm him under the guise of RICO continuity, unless those improper acts directed toward others are functionally related to the acts which harmed the plaintiff. . . .  A civil plaintiff may not use one type of conduct (acts directed at him) to satisfy the relationship test, and then invoke a second type of conduct (unrelated acts directed at others) to fulfill the continuity test absent similar types of conduct and victims who are essentially in the same position.  Only predicate acts that are related to each other may be used to satisfy both [prongs of the relationship-plus-continuity test].

*Id.* at 569-70.

For similar reasons, the alleged fraud directed at Dominion is insufficiently related to the frauds against Plaintiffs to constitute a pattern of racketeering activity.  Here are the key allegations that establish the timeline and motivations of the alleged racketeering activity.  The Coke Breeze scheme occurred in 2011-2012.  SAC ¶¶ 32-48.  Dominion discovered the scheme by February 15, 2012.  *Id.* ¶ 38.

Over two years later, in July 2014, Peters's other company Taylor Rose obtained the loan from CB&T.  SAC ¶ 66.  Peters's alleged predicate frauds that left him indebted to Plaintiffs occurred in July 2014, "late 2014," and January 2015.  *Id.* ¶¶ 89-96.  The deal between Peters and Plaintiffs regarding the cannel coal sales was struck in January 2015.  *Id.* ¶ 108.  And, according to the demand letter, Elza began removing the secured cannel coal in February 2015.  D.E. 1-1 at 3; SAC ¶ 170.  Plaintiffs allege that the pre-deal frauds (plus shortfalls in paying for work related to the cannel coal) left Peters owing them $1,424,084.40, "some or all of which fraudulently-obtained funds were used for payment of the [Taylor Rose] Loan."  SAC ¶ 101.  "[S]ome or all of the [$1.4 million] was used by the Peters Defendants and/or the Tomlin Defendants to make Loan payments to CB&T."  *Id.* ¶ 102.  And, "a number of the aforesaid transactions had been undertaken by Peters in an effort to defraud the plaintiffs for the purpose of relieving the Peters Defendants and/or the Tomlin Defendants from personal liability and/or other obligations to CB&T and/or the U.S.D.A. [under the loan]."  *Id.* ¶ 103.  Regarding the deal

whereby Aces High was to load and help deliver the cannel coal, Plaintiffs allege Defendants conspired "during the aftermath of the initial set of frauds, to attempt to defraud the plaintiffs and others, by seeking falsely to blame them for the losses, and to attempt recovery of the Loan debt from the plaintiffs and/or Kolmar and Noble." *Id.* ¶ 135.  To this end, according to Plaintiffs, the demand letters were sent on August 21, 2015.  *Id.* ¶ 170.  Thus, the racketeering activity directed at Plaintiffs began—at the very earliest—in July 2014 when the loan was obtained, and ended with the demand letters in August 2015—a span of about thirteen months.  The question again is whether both alleged schemes "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Vild*, 956 F.2d at 566.

First, the Dominion scheme and Peters's frauds against Plaintiffs have dissimilar purposes.  By diluting the coal with Coke Breeze, the Peters Defendants' purpose was to cheat Dominion out of the benefit of its bargain and line their own pockets.  And Dominion has successfully sued Bransen Energy for breach of contract.[3]  In contrast, Plaintiffs allege that Defendants' fraudulent acts toward them were motivated by the need to obtain money to pay off the Taylor Rose loan.  SAC ¶ 135.  Peters allegedly defrauded Plaintiffs by failing to pay what he had promised to pay (regarding the barges, the trainload of coal, and the bond purchase).  He then allegedly defrauded them further by hiring them to sell coal that was—unbeknownst to Plaintiffs—subject to a bank lien.  Finally, he conspired with others to extort money from Aces High, Kolmar, and Noble Energy via the demand letters—again in an attempt to satisfy the loan.  Because the frauds against Plaintiffs were driven by the need to repay the loan, their purpose was different from the scheme against Dominion.

---

[3] The case of *Virginia Electric and Power Co. v. Bransen Energy, Inc.*, No. 3:14-CV-538, 2016 WL 590464 (E.D. Va. Feb. 11, 2016), is on appeal before the Fourth Circuit in case number 16-1254.

The victims were also different.   Dominion and Aces High are only similar to the extent that they are part of the coal industry.   Dominion is an electric utility, a client of Peters Defendants and end-user of the coal they sold.   Aces High is a company devoted to purchasing, selling, and financing coal.   SAC ¶ 22.   The alleged Aces High scheme was designed to sell bank-secured coal through Aces High in order to frame Aces High for conversion and then extort Aces High (and Kolmar and Noble Energy) through the bank's legal demands.   *Id*. ¶ 135. Dominion is a utility that was cheated through a breach of contract.   Aces High acted as a middleman and, allegedly, as a scapegoat in a bank fraud scheme.[4]   Despite operating in the same industry, Dominion and Aces High are no more similar than the two groups of alleged victims in *Vild*.

Third, the methods of commission were different.   In the first scheme, Peters Defendants diluted coal.   In the second scheme, Peters Defendants refused to pay debts and then crafted a conspiracy to extort money from Aces High, Kolmar, and Noble by selling them secured coal and then claiming it had been stolen.   *See* SAC ¶¶ 170, 186-87, 293.   Although both schemes involve coal, their methodology is distinct.

In light of these differences, the Dominion scheme and the cannel coal scheme are not "interrelated by distinguishing characteristics."   *Vild*, 956 F.2d at 566.   Like the schemes in *Vild*, they relate to the same very general subject matter (here, the coal industry as opposed to a real estate development).   But, as described in the SAC, the two schemes—separated by years of time and hundreds of miles of space—are "isolated events" that do not coalesce into a larger pattern of racketeering activity.   *Id*. at 566, 568; *see also Prater v. Livingston Ave. Child Care, LLC*, No. 2:14-CV-490, 2015 WL 1439322, at *6 (S.D. Ohio Mar. 27, 2015) (applying *Vild*).   This case is

---

[4] To the extent that Plaintiffs construe CB&T and the U.S.D.A. as victims of the Peters conspiracy (*see* SAC ¶¶ 70-71, 77-78), these entities are wholly dissimilar from Plaintiffs and Dominion.   And the alleged schemes against CB&T and the U.S.D.A. are wholly dissimilar from the other alleged schemes.

closer to *Vild* and *Prater* than to other cases in which relationship was established, *e.g.*, *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 355 (6th Cir. 2008); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006); *Wallace v. Midwest Fin. & Mortgage Servs., Inc.*, No. 2:07-CV-131-DLB, 2014 WL 6610188, at *7-8 (E.D. Ky. Nov. 19, 2014); *FFP Holdings, LLC v. Moeller*, No. 3:14-CV-693, 2014 WL 4322804, at *8 (N.D. Ohio Aug. 29, 2014); *SAAP Energy v. Bell*, No. 1:12-CV-98, 2013 WL 4588828, at *6 (W.D. Ky. Aug. 28, 2013); *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 630 (E.D. Ky. 2011); *Bloodstock Research Info. Servs., Inc. v. Edbain.com, LLC*, 622 F. Supp. 2d 504, 514 (E.D. Ky. 2009).

Therefore, Plaintiffs cannot rely on the Dominion fraud to establish a pattern of racketeering activity. The Dominion scheme is not sufficiently related to the other alleged predicate acts. Without the Dominion scheme, the predicate crimes all relate, at most, to only one scheme involving the CB&T loan and the cannel coal.

### 2. Plaintiffs Fail the Continuity Test

Without the Dominion fraud as a predicate crime, the pattern of activity involving the cannel coal was too brief to constitute a closed-ended pattern. Nor could it be an open-ended pattern because the frauds were not Defendants' normal way of doing business or continuing in nature. Plaintiffs' claim thus fails the continuity test.

### a. No Open-Ended Pattern

Plaintiffs have not successfully pleaded an open-ended pattern of racketeering activity. An "open-ended" pattern is a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409-10 (6th Cir. 2012). The predicate acts themselves could, for instance, "include a specific threat of repetition extending indefinitely into

16

the future." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). Or, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

In support of their argument that they have pleaded an open-ended pattern, Plaintiffs rely on *Kalitta Air, LLC v. GSBD & Associates*, 591 F. App'x 338 (6th Cir. 2014), which explains:

> Open-ended continuity may be present if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Even when the number of related predicates involved may be small and they may occur close together in time, if the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, this supplies the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.
>
> One consideration is whether a complaint alleges an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point. The plaintiffs' allegations must support a systematic threat of ongoing fraud. At the same time, the threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate acts may, and indeed should, be considered.

*Kalitta Air*, 591 F. App'x at 344 (citations and quotation marks omitted); *see* D.E. 138 at 28-31.

Here, the SAC does not establish "a distinct threat of long-term racketeering activity." *Kalitta Air*, 591 F. App'x at 344 (quoting *H.J., Inc.*, 492 U.S. at 242). First, the activity involving the cannel coal terminated when Aces High recouped its $1.4 million and moved its last load of coal at the West Virginia site on April 16, 2015. SAC ¶ 124. By that time, Plaintiffs and Peters Defendants had ceased communicating and were not likely to conduct business together again. *Id.* ¶¶ 86, 100. Second, the demand letters were solely and uniquely targeted at Aces High and the two downstream buyers of the cannel coal. And the letters explicitly stated that CB&T's goal was to recover the coal or obtain funds equal to the coal's fair market value in

order to protect the value of its collateral against the Taylor Rose loan.   D.E. 1-1 (asking $6,375,000 to settle with Aces High); D.E. 1-2 (asking Kolmar to provide information regarding the coal, "including all quantities obtained and amounts paid").

To reiterate, according to the SAC, the engine driving the cannel coal deal and the demand letters was the unpaid balance on the Taylor Rose loan.   According to Plaintiffs, the entire scheme was born of desperation.   Peters Defendants had no way to repay the loan when the Irish briquettes deal failed (SAC ¶¶ 132-33; D.E. 138 at 6, 12), and the bank joined the conspiracy because it would be ruined if the loan defaulted (SAC ¶¶ 3, 80, 135, 137, 267; D.E. 138 at 8).

Presumably, then, had the loan been satisfied, the racketeering activity would have ceased.   Because the alleged racketeering acts were driven by the need to satisfy the loan, the acts did not "include a specific threat of repetition extending indefinitely into the future."   *Kalitta Air*, 591 F. App'x at 344 (quoting *H.J., Inc.*, 492 U.S. at 242).   The scheme was thus "inherently terminable" with "a built-in ending point."   *Id*. (quoting *Heinrich*, 668 F.3d at 410).   Satisfying the loan or (from CB&T's point-of-view) reacquiring the collateral would extinguish the motivation driving the scheme.

Nor does the SAC establish that racketeering was "part of an ongoing entity's regular way of doing business."   *Kalitta Air*, 591 F. App'x at 344.   In fact, prior to the summer of 2014, Plaintiffs and Peters Defendants "engaged in a large volume of business" that was untainted by the fraudulent scheme.   SAC ¶ 27.   Plaintiffs describe Peters as generally "highly connected, reliable and trustworthy."   *Id*. ¶ 29.   And the SAC makes no accusation that Bank Defendants have perpetrated any frauds unconnected to the Taylor Rose loan.   Plaintiffs may speculate in

18

their briefs that there are other victims and a continuing scheme, but this speculation is insufficient to properly plead an open-ended pattern.

Thus, this case is not "almost identical" to *Kalitta Air*, as Plaintiffs claim.  D.E. 138 at 29. The Court in *Kalitta* found an open-ended pattern on the basis that racketeering activity was the defendants' regular way of doing business that could be continued indefinitely.  *Kalitta Air*, 591 F. App'x at 345.  According to the *Kalitta Air* complaint, the defendants, who short-changed customers that bought jet fuel through an escrow scheme, were continuing to sell jet fuel and had ensnared another victim through "a very similar scheme."  *Id*.  The fraudulent agreement involved an evergreen contract and "could have continued indefinitely."  *Id*.  Here, in contrast, the Dominion scheme and the cannel coal scheme (as previously discussed) are not closely related enough to be counted together as a pattern of racketeering activity.  What we have is a single alleged scheme driven by the desperate need to repay a loan.  As such, the scheme was not indefinite, it was not Defendants' regular way of doing business, and *Kalitta Air* is readily distinguishable.

### b.  No Closed-Ended Pattern

To successfully plead a closed-ended pattern of racketeering activity, Plaintiffs must allege "a series of related predicates extending over a substantial period of time."  *H.J. Inc.*, 492 U.S. at 242.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement[.]"  *Id*.

The Sixth Circuit appears to have a bright-line 17-month rule.  In *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994), the Court found that a 17-month scheme was too short to support a closed-ended pattern of racketeering activity.  The Court continues to adhere to that time frame limitation.  *See, e.g.*, *Kalitta Air*, 591 F. App'x at 344; *Heinrich*, 668 F.3d at 410

("This court has found that racketeering activity that spanned seventeen months did not constitute a substantial period of time."); *Griffin v. Jones*, No. 5:12-CV-00163, 2014 WL 4851785, at *8 (W.D. Ky. Sept. 29, 2014).

Plaintiffs have detailed their version of the relevant timeline. In their responses to Peters and Tomlin Defendants' motions to dismiss, Plaintiffs recast the racketeering activity as a six-phase scheme. D.E. 141 at 35-38. The phases are:

1) The plot to defraud Dominion, late 2010-2012.

2) Obtaining the loan from CB&T, secured by the U.S.D.A., July 24, 2014.

3) Peters's four swindles which left him $1.4 million in debt to Aces High, July 2014 to February 2015.

4) "[W]hen Peters claimed to 'own the whole pile' of cannel coal in a text to Trimble," January 2015, which "lulled Aces High into agreeing to perform a new $1,400,000.00 in work loading and screening the cannel coal for the sales, in lieu of seeking to collect the $1,424,084.40 lost in the fraudulent transactions with Peters." D.E. 141 at 37.

5) The demand letter to Aces High.

6) The demand letters to Kolmar and Noble Energy.[5]

Of course, the Dominion fraud does not count for the reasons discussed above. The date "Taylor Rose entered into a loan agreement with CB&T on July 24, 2014," marks the earliest precisely-identified predicate fraud in the cannel coal scheme.[6] *Id*. ¶ 174. The SAC clearly

---

[5] See also Plaintiffs' list of ten racketeering acts targeted at them. D.E. 138 at 31-32.

[6] Plaintiffs contend that fraud was committed in obtaining the loan. Specifically, they claim that CB&T and the U.S.D.A. were not informed that Bransen Engery had been declared to be in default of its agreements with Dominion, but no specific date concerning such misleading conduct is identified in the SAC. SAC ¶ 67-70. Such fraud would obviously pre-date the loan itself. But, Plaintiffs do claim that the notice of default was sent by Dominion to Bransen Energy on July 21, 2014. *Id*. at ¶ 46. Certainly that declaration of default could not be

establishes July 2014 as the origination date of the scheme: "Under financial stress, and unbeknownst to Aces High and Elza, in or about July 2014, some or all the Peters Defendants joined forces with some or all of the other Tomlin Defendants in coordinating their efforts to obtain a loan for the financially strapped Peters Defendants, presumably related to the Irish coal briquette project." *Id*. ¶ 62. July 2014 marks the beginning of the scheme.

When did Defendants' alleged scheme end? Aces High screened its last load of the cannel coal on April 16, 2015. SAC ¶ 124. On April 21, 2015, Tomlin contacted Elza regarding a purchase order that was allegedly forged by Peters. *Id*. ¶¶ 138-41. Plaintiffs allege that the related call, email, and text messages are predicate wire/bank frauds. *Id*. ¶¶ 139, 141, 143. Then, a meeting on May 11, 2015, seems to be when the lid was blown off the alleged conspiracy. *Id*. ¶¶ 147-56. Finally, the demand letters were sent on August 21, 2015. *Id*. ¶¶ 170, 175. The scheme thus appears to have endured for thirteen months at most. This duration is obviously insufficient to form a closed-ended pattern given the Sixth Circuit's holding that 17 months is too short.

The parties have differing calculations. Plaintiffs admit that the predicate frauds, not counting the Dominion scheme, "occurred over about ten months." D.E. 138 at 27. Peters Defendants count the relevant period as a maximum of thirteen months. D.E. 152 at 8. Clearly, either falls below the Sixth Circuit's 17-month threshold.

No matter how you slice it, the scheme related to the loan is too short to constitute a closed-ended pattern of racketeering activity. *See Griffin*, 2014 WL 4851785, at *8 (finding fourteen months too short). Plaintiffs' RICO claim under § 1962(c) fails the relationship-plus-continuity test.

---

fraudulently concealed before it occurred. Thus, these claimed acts of fraud do not significantly extend the period of time in question.

## B.  Section 1962(b)

Count three alleges a violation of § 1962(b).  SAC ¶¶ 261-64.  Section 1962(b) makes it unlawful for "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in . . . interstate or foreign commerce."

> In order to recover under this section, a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts.  Such an injury may be shown, for example, where the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise.  In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is as a result of racketeering.  It is not enough for the plaintiff merely to show that a person engaged in racketeering has an otherwise legitimate interest in an enterprise.   Rather, it must be established firmly that there is a nexus between the interest and the alleged racketeering activities.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1190 (3d Cir. 1993) (citations and quotation marks omitted).  Particularly relevant to this count is the requirement that Plaintiffs allege a RICO injury "in addition to injury from the predicate acts."  *Id*.   "The classic example of a § 1962(b) injury is where the owner of a legitimate business is injured by infiltration of the business by racketeering activity such as loan sharking or extortion."  *Hilliard v. Shell W. E & P, Inc.*, 885 F. Supp. 169, 174 (W.D. Mich. 1995).  "[T]he congressional intent of § 1962(b) was to prevent racketeers from acquiring control of businesses."  *Whaley v. Auto Club Ins. Ass'n*, 891 F. Supp. 1237, 1241 (E.D. Mich. 1995) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 181-82 (1993)), *aff'd*, 129 F.3d 1266 (6th Cir. 1997).  In other words, under § 1962(b), "plaintiffs must allege an 'acquisition' injury;" *i.e.*, that their injury "was caused by the acquisition of an enterprise."  *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991).

22

Here, Plaintiffs have not alleged that any Defendant took or exercised control of the enterprise through racketeering activity.  There is no "acquisition injury."  The alleged enterprise includes Peters, Peters's two companies, Tomlin, and Tomlin's company Riverside.  SAC ¶ 252.  According to the SAC, these companies existed before any alleged predicate acts occurred.  Peters and Tomlin have legitimate interests in their own companies, and there is no allegation of irregularity in Tomlin's investing in Peters's company Taylor Rose.  *Id.* ¶ 63.  Accordingly, Plaintiffs' legal argument regarding Count Three appears to misapprehend the nature of a subsection (b) claim.  Plaintiffs allege:

> Taylor Rose and/or Bransen Energy may have been perceived by the business community as being legitimate businesses which, in actuality through the activities described above, were controlled and manipulated by defendants for use by the Peters Association in defrauding the plaintiffs through a pattern of racketeering activity as set forth above, all within the meaning of 18 U.S.C. § 1962(b).

*Id.* ¶ 263.  Plaintiffs' subsection (b) claim is simply a restatement of their subsection (c) claim in Count Two.  They have not attempted to argue any "injury from the defendant's acquisition or control of an interest in a RICO enterprise, *in addition to injury from the predicate acts*."  *Lightning Lube*, 4 F.3d at 1190.  Instead, the only injuries Plaintiffs allege are those that result from the predicate acts.  Count Three must be dismissed for failure to sufficiently plead any sort of "acquisition injury" under § 1962(b).

### C.  Section 1962(d)

Section 1962(d), the ground of Count Four, establishes conspiracy liability under RICO.  *See* SAC ¶¶ 265-69.  The statute makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  "To plausibly state a claim for a violation of 18 U.S.C. § 1962(d), plaintiffs must successfully allege all the elements of a RICO violation, as well as alleging 'the existence of an illicit agreement to violate the substantive

23

RICO provision.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 411 (6th Cir. 2012) (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)).   Because Plaintiffs have not successfully alleged all the elements of a RICO violation (as discussed above), they have no conspiracy claim under § 1962(d).   *See Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 806 (6th Cir. 2015) ("While the facts, as pled, show ample evidence of agreement . . ., Plaintiffs' RICO conspiracy claim fails because Plaintiffs failed to allege a substantive RICO violation in the first place.").   Count Four must also be dismissed under Rule 12(b)(6) for failure to state a valid claim.

## IV.

Because Plaintiffs' RICO claims must be dismissed, their other claims may also be dismissed.   As the SAC makes clear, Plaintiffs believe federal subject matter jurisdiction is appropriate solely on account of "federal questions arising under 18 U.S.C. § 1961 *et seq*."   SAC ¶ 18.   The question now is whether the Court should exercise its discretion and maintain supplemental jurisdiction over Plaintiffs' other claims.   A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).   The Court may raise this issue *sua sponte*.   *See Devlin v. Kalm*, 594 F.3d 893, 894 n.3 (6th Cir. 2010).

Plaintiffs and Intervening Plaintiffs have pleaded a claim under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.   SAC ¶¶ 233-50; D.E. 62.   However, "[t]he Declaratory Judgment Act does not create an independent basis for federal subject matter jurisdiction." *Heydon v. MediaOne of Southeast Michigan, Inc.*, 327 F.3d 466, 470 (6th Cir. 2003).   Such a claim does not trigger original federal jurisdiction unless it satisfies the well-pleaded complaint

rule; *i.e.*, that a federal question must appear on the face of the complaint rather than as part of a defense. *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 (6th Cir. 2012).

> In the declaratory-judgment context, whether a federal question exists is determined by reference to a hypothetical non-declaratory suit (i.e., a suit for coercive relief) between the same parties; if a federal question would appear in the complaint in this hypothetical suit, federal jurisdiction exists over the declaratory-judgment action. In cases in which the plaintiff seeks a declaratory judgment that he would have a valid defense to an anticipated claim, we consider whether a federal question would arise in a hypothetical non-declaratory suit in which the declaratory-judgment defendant is the plaintiff and the declaratory-judgment plaintiff is the defendant.

*Id*. (citing *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 19 (1983); *AmSouth Bank v. Dale*, 386 F.3d 763, 775 (6th Cir. 2004)).

Here, the relief Plaintiffs and Intervenors seek is a declaration concerning "the rights and responsibilities" of the parties in relation to the cannel coal sales. SAC ¶¶ 234, 248; D.E. 62 at 20-23. And determining these rights depends on the application of West Virginia law. SAC ¶¶ 238-39, 244-47; D.E. 62 at 21-23. Transforming these nearly-identical claims into a hypothetical non-declaratory suit, no federal question or defense materializes. Plaintiffs' and Intervenors' declaratory judgment actions do not trigger original federal jurisdiction under the well-pleaded complaint rule. In any event, the Declaratory Judgment Act "confers discretion on courts" to render a declaratory judgment, "not rights on litigants" to demand one. *Am. Home Assurance Co. v. Evans*, 791 F.2d 61, 64 (6th Cir. 1986).

In applying their discretion to exercise supplemental jurisdiction over declaratory judgment actions, courts in this Circuit consider the following factors:

> (1) whether the judgment would settle the controversy;
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
(5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000).

Factor five favors dismissal because Plaintiffs could bring their declaratory judgment action in another nearby venue, such as Kentucky or West Virginia state court. For example, this Court has previously found that Kentucky law generally "provides an alternative remedy to declaratory judgment in federal court." *Grange Mut. Cas. Co. v. Safeco Ins. Co. of Am.*, 565 F. Supp. 2d 779, 790 (E.D. Ky. 2008); *see also Jordan Ice Co. v. Grange Mut. Cas. Co.*, No. 0:06-CV-142-DLB, 2006 WL 3497767, at *5 (E.D. Ky. Dec. 4, 2006) ("Kentucky does provide an adequate procedure for a declaration of rights action.").

Factor three also weighs in favor of dismissal. This lawsuit arose in response to a threatened lawsuit against Plaintiffs by CB&T. Issuing a declaratory judgment now would give Plaintiffs and/or Intervenors a procedural trump card, should CB&T file suit. *See* D.E. 144 at 2 ("[We] filed this declaratory judgment action [because we will] likely be named as a party in a future subsequent action by CB[&]T.").

In light of the fact that Plaintiffs assert multiple state law claims in this action, the other factors do not tip the scales in favor of federal jurisdiction over the declaratory judgment action. "In 1949 the Sixth Circuit warned district courts not to exercise jurisdiction over a declaratory judgment action 'unless it serves a useful, practical purpose.'" *Grange Mut. Cas. Co.*, 565 F. Supp. 2d at 792 (quoting *Panhandle E. Pipe Line Co. v. Mich. Consol. Gas Co.,* 177 F.2d 942, 944 (6th Cir. 1949)); *see also Am. Home Assur. Co.*, 791 F.2d at 63 (questioning the need for "declaratory judgments in federal courts when the only question is one of state law and when there is no suggestion that the state court is not in a position to define its own law in a fair and

impartial manner").  The Court here heeds that warning and will not entertain jurisdiction over either the Plaintiffs' or Intervenors' request for declaratory judgment.  All that remains are state law tort claims.

In determining whether to retain jurisdiction over state-law claims, district courts weigh several factors, including the "values of judicial economy, convenience, fairness, and comity." *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 952 (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)).  "If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 385 (6th Cir. 2003)).

In this case, discovery has not yet commenced.  The federal claims are dismissed hereby, and the Court has declined to issue a declaratory judgment.  Nothing here weighs against the Court's general practice of dismissing the state claims without prejudice.  Dismissal would be economical and would respect the states' interest in deciding claims arising under their own laws.  *See Hot-Shot Motorworks v. Falicon Crankshaft Components*, No. 3:13-CV-1322, 2014 WL 346435, at *788 (N.D. Ohio Jan. 30, 2014) (declining jurisdiction over state law claims after dismissing civil RICO claim); *Perkins v. Rieser*, No. 3:07-CV-325, 2012 WL 2408736, at *5 (S.D. Ohio June 26, 2012) (same), *report and recommendation adopted*, 2012 WL 4483149 (S.D. Ohio Sept. 27, 2012).

**V.**

A few loose ends require tying.  First, Plaintiffs and Intervening Plaintiffs have moved for a hearing.  D.E. 155, 156.  Plaintiffs argue that the motions are complex and that Defendants' analyses have "significant shortcomings" related to pertinent facts.  D.E. 155.  Intervening Plaintiffs "believe it would be of benefit to the Court to have Oral Argument to flush out the complete factual history that is before the Court and assist the Court in clarifying any areas of vagueness the Court may have in regard to what transpired among the parties."  D.E. 156-1 at 1.

The Court is not persuaded this is necessary.  Plaintiffs and Intervenors have had plenty of opportunity to make their case and clarify their positions through hundreds of pages of briefing.  In any event, in the current posture the Court has accepted all their factual allegations as true.  Doing so, it is clear Plaintiffs have failed to state a federal claim upon which relief can be granted.  Because the complaints will be dismissed, the motion for a hearing will be denied as moot.

Additionally, Plaintiffs have moved to initiate limited discovery.  D.E. 163.  "The plaintiffs are concerned that documents may be lost by third parties, and that critical information exchanges by the parties is not being produced."  *Id*. at 3.  Defendants oppose the motion.  D.E. 165, 166, 167, 168.  Plaintiffs have clarified that "they seek only to commence initial disclosures pursuant to Fed. R. Civ. P. 26(a), and to subpoena third parties who the plaintiffs believe may have documents that need to be preserved."  D.E. 169 at 1.  Because the Court has decided to dismiss the case in full, this motion will also be denied as moot.

**VI.**

In conclusion, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendants' motions to dismiss Plaintiffs' Second Amended Complaint (D.E. 117, 119, 118, 121) are **GRANTED** for the reasons stated above**.**  Plaintiff's federal RICO claims in Counts Two, Three, and Four are **DISMISSED WITH PREJUDICE.**  Because the Court declines to exercise jurisdiction over the declaratory judgment action and to exercise supplemental jurisdiction over the state law claims, all other claims are **DISMISSED WITHOUT PREJUDICE.**

2. Defendants' motions to dismiss Intervening Plaintiffs' Complaint for Declaratory Judgment (D.E. 124, 125, 128) are **GRANTED** for the reasons stated above**.**  The Court declines to exercise jurisdiction, and the declaratory judgment claim is **DISMISSED WITHOUT PREJUDICE.**

3. Plaintiffs' and Intervening Plaintiffs' motions for a hearing (D.E. 155, 156) are **DENIED** as moot.

4. Plaintiffs' motion "Seeking Relief from F.R.C.P. 26(d) and F.R.C.P. 26(f)" (D.E. 163) is **DENIED.**  *See* D.E. 100 (referring all nondispositive pretrial motions to the undersigned).

5. Any basis for dismissal raised in any of the pending motions to dismiss that is not addressed above need not be resolved because the bases addressed above are sufficient to dismiss the case in full.

6. Plaintiffs' action is stricken from the active docket of the Court.

This the 3rd day of November, 2016.



Signed By:

*Hanly A. Ingram*

United States Magistrate Judge