**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**AT LONDON**

**CIVIL ACTION NO. 15-161-DLB-HAI**

**ACES HIGH COAL SALES, INC.**                                    **PLAINTIFF**


**vs.**                    **MEMORANDUM OPINION AND ORDER**


**COMMUNITY TRUST & BANK OF WEST GEORGIA, et al.**         **DEFENDANTS**

*** *** *** ***

## I.    Introduction

Defendants initially moved to dismiss Plaintiffs' Second Amended Complaint in March 2016, and moved to dismiss Intervening Plaintiffs' Complaint in April 2016. Those motions were granted in a memorandum opinion and order entered on November 3, 2016. (Doc. # 170). Plaintiffs and Defendants have now moved to alter or amend that order.

## II.    Factual Background

This case is the product of a lengthy, complicated set of facts involving a large number of parties. The Plaintiffs, Aces High Coal Sales, Inc. ("Aces High") and Wendell Elza, brought claims against Defendants Community Bank & Trust of West Georgia ("CB&T"), William R. Stump, Jr. (individually and as officer and director of CB&T), Taylor Rose Energy, LLC ("Taylor Rose"), Bransen Energy, Inc. ("Bransen Energy"), Michael Peters, Kyle Tomlin, Riverside Advisors, LLC ("Riverside"), Troutman Sanders, LLP ("Troutman Sanders"), and Michael E. Johnson, Esq, seeking a declaratory judgment and alleging fraud, tortious interference, libel, unjust enrichment, and RICO claims. Intervening

1

Plaintiffs, Mike Trimble and Trimble Coal Sales, also brought a claim against all of the named defendants for a declaratory judgment. The defendants can be categorized into four (4) groups as follows:

- Peters Defendants - Michael Peters and his two companies, Taylor Rose and Bransen Energy

- Tomlin Defendants - Kyle Tomlin and the company he works for, Riverside

- Bank Defendants - CB&T and its President, William Stump

- Troutman Sanders Defendants - the law firm Troutman Sanders and attorney Michael E. Johnson

Plaintiff Aces High buys, sells, and finances the purchase of coal by third parties. (Doc. # 111 at ¶ 22). Intervenor Plaintiff Michael Trimble is also in the business of buying and selling coal, and finalizing the purchase of coal for third parties. (Doc. # 62 at ¶ 27). Michael Trimble conducts business with Trimble Coal Sales, LLC, as a joint venturer. *Id.* at ¶ 28.

In or around early 2011, Trimble introduced Aces High's sales manager, Wendell Elza, to Defendant Michael Peters. (Doc. # 111 at ¶ 22). Peters informed Elza that he had contacts with Dominion Virginia Power ("Dominion"), an electrical utility that was building a plant in Virginia. *Id.* Aces High subsequently entered into a contract with one of Peters's companies, Bransen Energy, to stockpile coal while the Dominion plant was being built. *Id.* at ¶ 23. Several months later, Aces High began delivering the coal to the stockpile location pursuant to the contract. *Id.* at ¶ 24. Elza and Peters became friends, and continued to "engage[] in a large volume of business in the ensuing years." *Id.* at ¶¶ 26-27.

2

But, according to Plaintiffs, Peters engaged in fraudulent activity throughout their years-long relationship.

First, Plaintiffs claim that Peters defrauded Dominion. Bransen Energy entered into an agreement with Dominion to supply a substantial portion of the performance fuel needed to power the new plant. *Id.* at ¶ 31. Under the terms of the agreement, Bransen would supply Dominion with "run-of-mine" coal. *Id.* at ¶ 32. As part of that agreement, Bransen contracted with Aces High to deliver the coal for Dominion. *Id.* at ¶ 33. Unbeknownst to Plaintiffs, Peters had mixed "coke breeze"[1] in with the "run-of-mine" coal that was delivered to Dominion. *Id.* at ¶ 37. In 2014, Dominion terminated its agreement with Bransen, and filed a complaint against Bransen in federal court in Virginia. *Id.* at ¶¶ 48-49. The court entered partial summary judgment in Dominion's favor, and Dominion later obtained a sizeable judgement against Bransen. *Id.*

Next, Plaintiffs assert that Peters defrauded others in a scheme to sell cannel coal briquettes. Allegedly, Peters engaged in this scheme with the Tomlin Defendants. Defendant Kyle Tomlin is a hedge fund manager for Riverside Advisors, LLC. *Id.* at ¶ 82. At some point, Tomlin introduced himself to Elza as Peters's partner. *Id.* Plaintiffs learned about the briquette scheme from Peters's and/or Tomlin's purported employees. *Id.* at ¶ 127. The employees told Plaintiffs that a building was loaded with bags of briquettes in order to appear full to prospective financial partners, when in reality, the building was empty past the first few layers. *Id.* at ¶ 127-28. Allegedly, Peters and Tomlin used this scheme to defraud CB&T into approving them for a loan. *Id.*

---

[1] According to Plaintiffs, "coke breeze" is "not coal at all," but a "byproduct of the coking process." (Doc. # 111 at ¶ 34).

3

In 2012, Peters informed Elza that he was involved in a deal with an Irish importer, in which he would sell the cannel coal briquettes in Ireland for home heating. *Id.* at ¶ 52. Peters explained that he and Tomlin were working to put together financing for the briquette sales. As his part of the deal, Tomlin would bring in capital by investing into Taylor Rose, another one of Peters's companies. *Id.* at ¶ 53. This deal eventually fell through when an Irish official determined that the briquettes could not be sold in Ireland. *Id.* at ¶ 129. As a result, Peters could not make the payments on his loan from CB&T. *Id.* at ¶ 133.

After the briquette deal failed, Peters advised Elza that he was selling the cannel coal to domestic buyers. *Id.* at ¶ 54. Aces High found a buyer for some portion of the cannel coal, and paid Bransen $250,000 for 25,000 tons. *Id.* at ¶ 55. A few days later, Aces High purchased more of the cannel coal, and voluntarily paid Bransen double the amount charged. *Id.* Aces High continued to prepare, load, and ship the cannel coal on a regular basis through February 2015. *Id.* at ¶¶ 55-59. Aces High was not aware that the cannel coal was subject to a lien by CB&T. *Id.* at ¶¶ 60-61.

In July 2014, the Peters Defendants and Tomlin Defendants joined together to obtain a loan for Peters, allegedly because they were under financial stress after the Irish briquette deal fell through. *Id.* at ¶ 62. Tomlin had invested in Peters's company, Taylor Rose, and thus, the infusion of capital into one of Peters's companies would also benefit Tomlin directly. *Id.* at ¶ 63. Tomlin had a relationship with a bank, CB&T, and undertook efforts to obtain a loan from them on Taylor Rose's behalf. *Id.* at ¶ 64. CB&T made a loan to Taylor Rose, which was secured by a piece of real property and the cannel coal located on the property. *Id.* at ¶¶ 72, 76. Taylor Rose represented that they owned the cannel

4

coal, but Bransen Energy was selling the same cannel coal to Aces High and others. *Id.* at ¶ 77.

Over time, Peters had incurred a large debt to Aces High. In or around July 2014, Aces High entered into a deal with Peters's other company, Bransen Energy, whereby Aces High would sell coal to Bransen, Bransen would sell the coal to Duke Power Company, and Aces High would deliver and load the coal for transport. *Id.* at ¶ 89. The agreement provided that Bransen would pay Aces High after Duke wired its payment to Bransen. *Id.* Bransen never paid Aces High for eight barge loads, but claimed that this was because Duke had never paid it. *Id.* at ¶ 90. Later in 2014, Peters told Elza that he had a buyer for some of the coal. *Id.* at ¶ 91. Aces High wired money to Bransen to purchase the coal to sell to the buyer. *Id.* Peters was supposed to repay Aces High within two weeks, but he never did. *Id.* In January 2015, Peters presented a deal to Aces High to purchase a bond to fund Taylor Rose. *Id.* at ¶ 92. Aces High loaned money to Peters, which he promised to repay with interest within five days. *Id.* at ¶ 93. Instead of repaying Aces High, Peters applied the money to an outstanding debt on the loan from CB&T. *Id.* at ¶ 96.

After incurring a debt of approximately $1.4 million owed to Aces High, Peters ceased communication with Elza. *Id.* at ¶ 104. Eventually, Elza contacted Trimble, who was still in communication with Peters. *Id.* Consequently, Trimble contacted Peters and advised him that he found a buyer for a large portion of the cannel coal. *Id.* at ¶ 105. Trimble proposed a deal in which he would sell coal to Eagle Coal Sales, which would yield enough profit for Peters to satisfy the debt owed to Aces High. *Id.* Aces High would be paid for its services rendered in loading and screening the coal sold by Trimble in lieu of being repaid its debts by Peters. *Id.* According to Plaintiffs, this arrangement "constituted

5

good and valuable consideration." *Id.* The arrangement also provided for Eagle Coal Sales to sell the coal it received to Kolmar Americas, Inc. in West Virginia and Noble Energy, Inc. in Kentucky. *Id.* at ¶ 106. Aces High performed its part of the deal, loading and screening coal at the West Virginia site until April 16, 2015, when it had "earned back the amounts unpaid by [Peters] together with repayment of its costs associated with screening and loading the cannel coal." *Id.* at ¶ 124.

Unbeknownst to Aces High, the cannel coal in the Eagle Coal Sales deal was subject to a lien as collateral for CB&T's loan to Taylor Rose. *Id.* at ¶ 174. On August 21, 2015, CB&T, through Michael Johnson, its attorney at Troutman Sanders, sent letters demanding payment for the allegedly secured coal that was taken by Aces High and sold without the bank's authorization. *Id.* at ¶ 170. One of the letters was sent to Plaintiffs' attorney James David Johnson. *Id.* at ¶ 170. The letter asserted that CB&T held a security interest in the coal that was wrongfully taken from Taylor Rose by Elza, without CB&T's consent. *Id.* The letter also claimed that Plaintiffs were civilly and criminally liable for taking the coal, and demanded immediate payment of the fair market value of the coal, estimated at $6,375,000. *Id.* at ¶ 185.

CB&T's attorney also sent letters to the two downstream purchasers of the secured coal, Kolmar and Noble. *Id.* at ¶ 205. According to the Complaint, "[i]t was the intent of CB&T, and the Troutman Sanders Defendants, undeservedly to cause Kolmar and Noble Energy to pay them monies toward the debt on the Loan, which debt was owed by the Tomlin Defendants and/or the Peters Defendants, with full knowledge of those defendants, all in a concocted scheme to defraud Kolmar and Noble Energy." *Id.* at ¶ 209.

6

## III.    Procedural Background

Soon after receiving the demand letters, Plaintiffs filed a complaint in this Court. (Doc. # 1).  On March 1, 2016, Plaintiffs filed a second amended complaint ("SAC"), requesting a declaratory judgment, alleging RICO violations, and asserting state law claims for fraud, libel, tortious interference, and unjust enrichment.  (Doc. # 111).  On March 31, 2016, Defendants initially moved to dismiss Plaintiffs' Second Amended Complaint (Docs. # 117, 118, 119, and 121), and on April 4, 2016 moved to dismiss the Intervening Plaintiffs' Complaint (Docs. # 124, 125, and 128).  The parties thereafter entered into an agreed order of referral, referring the motions to dismiss to Magistrate Judge Hanley Ingram for final resolution pursuant to 28 U.S.C. § 636(c).  (Doc. # 160).

The Magistrate Judge entered a final Order on the motions to dismiss on November 3, 2016, dismissing Plaintiffs' RICO claims for failure to state a claim.  (Doc. # 170).  He dismissed the remaining claims without prejudice, finding that the court did not have subject-matter jurisdiction over the supplemental state-law claims, and declining to exercise jurisdiction over the declaratory judgment action.  *Id.*  However, the parties all agreed that diversity jurisdiction existed in this case, and that the state law claims should not have been dismissed without prejudice.

Because the order was a final order, it was appealable directly to the circuit court. Plaintiffs and Intervenor Plaintiffs filed an appeal in the Sixth Circuit.  (Docs. # 171 and 172).  The Bank Defendants chose instead to file a motion to alter or amend the judgment. (Doc. # 173).  Subsequently, Plaintiffs also filed a motion to alter or amend.  (Doc. # 174). At this juncture, it was unclear whether the Magistrate Judge retained jurisdiction over the motions to reconsider pursuant to the Section 636(c) referral.  Accordingly, the Court

7

ordered the parties to file notice "describing [their] position as to whether the consent memorialized [in the agreed order of reference] include[d] consent for the [Magistrate Judge] to conduct all proceedings in relation to" the motions to alter or amend. (Doc. # 176).  Plaintiffs and Intervenor Plaintiffs indicated that they did not believe their prior consent extended to the motions to alter or amend (Docs. # 178 and 179), while Bank Defendants claimed that the Magistrate Judge *must* enter final judgment on the motions to reconsider (Doc. # 180).  Thus, while the Court believed that its prior referral order included all matters related to the motions to dismiss, including motions to reconsider, the parties' lack of explicit consent gave the Court pause.  Out of an abundance of caution and for good cause, this Court found that to the extent the prior referral did, in fact, encompass the motions to reconsider, it should be vacated.  Therefore, the Court entered a new order of reference, referring the pending motions to alter or amend to the Magistrate Judge for a recommended disposition pursuant to 28 U.S.C. § 636(b).  (Doc. # 181).

Accordingly, the Magistrate Judge reviewed the pending Rule 59(e) motions and prepared a Report and Recommendation ("R&R") for the Court.  (Doc. # 198).  In his R&R, the Magistrate Judge recommends granting the Bank Defendants' Rule 59(e) Motion, and granting in part and denying in part Plaintiffs' Rule 59(e) motion.  (Doc. # 198).  Specifically, the Magistrate Judge recommends vacating the prior order (Doc. # 170) and reinstating the Defendants' Motions to Dismiss, but recommends that the Court still dismiss the RICO claims with prejudice.  *Id.*  With respect to the state law claims, the Magistrate Judge recommends dismissing them all (Counts 5, 6, 7, 8, 9, and 10) with prejudice.  Finally, the Magistrate Judge recommends dismissing the declaratory judgment action without

8

prejudice.  The parties having filed objections to the R&R (Docs. # 199,[2] 200, 201, and 202), and responses to those objections having now been filed (Docs. # 203, 204, 205, 206, 207, 208, 209, 210, and 211), the R&R is ripe for the Court's review.

For the reasons explained herein, the Report and Recommendation of the Magistrate Judge will be **adopted in part** and **rejected in part**.  The Court will adopt the recommendation with respect to the state law claims.  That portion of the prior order will be vacated, and Defendants' Motions to Dismiss will be reinstated with respect to those claims.  However, the Court does not agree with the recommendation that the entire order should be vacated, and the RICO claims and declaratory judgment action reinstated.  The portions of the Court's prior order dismissing the RICO claims and declaratory judgment action will remain intact.

For ease of reference throughout the Court's analysis, the following chart provides a summary of which claims Plaintiffs bring against each group of Defendants:

**Plaintiffs' Claims by Defendant Group**

|  | Peters | Tomlin | Bank | Troutman Sanders |
|---|---|---|---|---|
| Declaratory Judgment | x | x | x | x |
| 1962(c) | x | x |  |  |
| 1962(b) | x | x |  |  |
| 1962(d) | x | x | x | x |

---

[2] The Bank Defendants' Objection is styled as a "Motion Seeking a Ruling by Judge Ingram on the Pending Motions Consistent With His Report and Recommendation" and corresponding objections.  (Doc. # 199).  Plaintiffs claim that this motion was "frivolous" and have moved for sanctions to be imposed against the Bank Defendants.  (Doc. # 214).  Plaintiffs' Motion for Sanctions will be considered herein.

| Libel per se | | | x | x |
|---|---|---|---|---|
| Tortious Interference | | | x | x |
| Fraud | x | x | | |
| Unjust Enrichment | | | x | |
| Constructive Trust | | | x | |
| Civil Conspiracy | x | x | x | |

## IV.    Analysis

### A.    Jurisdiction

This matter's complicated procedural history invites questions with respect to this Court's jurisdiction and standard of review.  As described above, there have been multiple referrals to the Magistrate Judge throughout the life of this case, each pursuant to a different section of the referral statute, and thus, providing for differing levels of review from the District Court.  Furthermore, Plaintiffs have appealed the Magistrate Judge's original order to the Sixth Circuit, while at the same time filing a motion to alter or amend the order in this Court.  This leaves the Court with multiple layers of jurisdictional questions and potential standards of review.  In light of this confusion, the Bank Defendants have moved for the Magistrate Judge to enter a final order on the pending motions.  Thus, it is necessary for the Court to peel back each layer to demonstrate its jurisdiction over the pending motions, and to explain the standards of review that will apply to the various issues.

### 1.  This Court has Jurisdiction despite the pending appeal

First, and most simply, this Court has jurisdiction over the motions to alter or amend despite an appeal having been filed in the Sixth Circuit.  Normally, an appeal would divest

10

the district court of jurisdiction. However, if a party files a motion to alter or amend a judgment under Federal Rule of Civil Procedure 59, "the time to file an appeal runs for all parties from the entry of the order disposing of [that motion]." Fed. R. App. P. 4(a)(4). Thus, "[w]hen a party has filed a timely motion to alter or amend a judgment after a notice of appeal has been filed, the district court still retains jurisdiction to consider the motion." *O'Sullivan Corp. v. Duro-Last, Inc.*, 7 F. App'x 509, 519 (6th Cir. 2001). Accordingly, the pending appeal does not divest this Court of jurisdiction over the motions to alter or amend.

### 2.    This Court has jurisdiction despite the prior referrals

Despite the multiple referrals to the Magistrate Judge throughout the course of this case, this Court presently has jurisdiction over the pending motions. To illustrate, it is necessary to walk through each referral, and the review process available for that referral.

First, the Defendants' motions to dismiss were originally referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Upon consent of the parties, a Magistrate Judge "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves." 28 U.S.C. § 636(c)(1); *see also* Fed. R. Civ. P. 73. Once a Magistrate Judge enters judgment in a case referred pursuant to Section 636(c)(1), an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court." 28 U.S.C. § 636(c)(3). In discussing the referral statute, the Supreme has stated:

> Unlike nonconsensual referrals of pretrial but case-dispositive matters under 636(b)(1), which leave the district court free to do as it sees fit with the magistrate judge's recommendations, a 636(c)(1) referral gives the

11

> magistrate judge full authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review.  A judgment entered by a magistrate judge designated to exercise civil jurisdiction under 636(c)(1) is to be treated as a final judgment of the district court, appealable in the same manner as an appeal from any other judgment of a district court.

*Roell v. Withrow*, 538 U.S. 580, 585 (2003) (internal quotations omitted).  Furthermore, a 636(c) referral to a Magistrate Judge may be vacated, but only for good cause shown upon the court's own motion, or for extraordinary circumstances shown by the parties.  28 U.S.C. § 636(c)(3).  Accordingly, a District Court does not have authority to review a final order entered by a Magistrate Judge pursuant to a 636(c) referral.

Here, the parties agreed for the District Court to refer the motions to dismiss to Magistrate Judge Hanley Ingram pursuant to 28 U.S.C. § 636(c).  The Order of Reference reflected the parties' consent to refer the motions to dismiss (Docs. # 117, 118, 119, 121, 124, 125, and 128) to the Magistrate Judge, and for the Magistrate Judge to "conduct all proceedings in relation thereto and enter a final order on the motions identified[.]"  (Doc. # 160 at 1).  The Order noted that the reference was "limited to the specified motions."  *Id.* at 2.  From the terms of the agreed order, it was clear that the Magistrate Judge had full authority to enter a final order on the motions to dismiss.  That order was not, and is not, subject to review by the District Court.

After the Magistrate Judge entered the final order on the motions to dismiss, Plaintiffs and Defendants filed motions to alter or amend that order.  Uncertainty ensued as to which judge should properly preside over those motions.  The Bank Defendants claim that the motions to alter or amend the order on the motions to dismiss falls within the Magistrate Judge's grant of authority to "conduct all proceedings in relation" to the motions to dismiss.  (Doc. # 199 at 6).  Plaintiffs, conversely, rely on the limiting language in the

Order to assert that their consent extended *only* to the explicitly identified motions to dismiss, and that subsequent motions to alter or amend are not part of the proceedings "in relation" to those motions.

As illustrated by the parties' dispute, the Magistrate Judge's authority to enter a final order on the motions to alter or amend hinges on whether those motions are "related" to the motions to dismiss. Indeed, the Rule 59(e) motions relate directly to the substance of the motions to dismiss that were referred to the Magistrate Judge, as they are merely motions for the Court to revisit its prior judgment on the referred motions. It follows that a final ruling on the Rule 59(e) motions would, in effect, serve as a final ruling on the referred motions to dismiss. Because the Magistrate Judge was explicitly granted authority to enter a final judgment on the Motions to Dismiss, the related Rule 59(e) motions to alter or amend that judgment should also fall within the scope of that authority. However, this case presented a more difficult question when Plaintiffs expressed doubt as to the scope of their consent. Because consent from the parties is required for a referral to a Magistrate Judge under § 636©, and because the scope of the consent in this situation was at least questionable, the Court found that there was good cause to enter a new order of reference. *See Ambrose v. Welch*, 729 F.2d 1084, 1085 (6th Cir. 1984) (per curiam) (finding that there must be "a clear and unambiguous statement in the record indicating that the parties consented to the exercise of plenary jurisdiction by the Magistrate").

Accordingly, for good cause shown, and upon the Court's own motion, the Court entered a new order of reference on December 14, 2016, referring the pending Rule 59(e) motions to the Magistrate Judge for a recommended disposition pursuant to 28 U.S.C. § 636(b). (Doc. # 181). Thus, to the extent that the prior referral order did confer authority

13

upon the Magistrate Judge to enter a final order on the Rule 59(e) motions, that authority was vacated.  Therefore, the Bank Defendants' Motion (Doc. # 199) for the Magistrate Judge to preside over the pending motions is **denied**.

### B.    Standard of Review

While the District Court has established jurisdiction over the pending motions to alter or amend, the standard of review it must employ it is not immediately clear.  Again, the Court will walk through each step of the proceeding to deduce the appropriate standard of review.  The motions presently before the Court were referred to the Magistrate Judge pursuant to § 636(b) for a report and recommendation.  Under a § 636(b) referral,  "the magistrate judge must promptly conduct the required proceedings" and "enter on the record a recommendation for disposing of the matter, including any proposed findings of fact."  28 U.S.C. § 636(b)(1)(B).  "The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed R. Civ. P. 72. Here, the parties raised specific and detailed objections to every part of the Magistrate Judge's R&R.  Thus, the motions to alter or amend are subject to *de novo* review. However, the District Court's review is complicated by the fact that the motions seek to alter or amend an order the Magistrate Judge entered pursuant to a referral for final judgment under § 636(c)(1).  The question arises, then, concerning the extent to which a District Court may review such an order, which is typically not reviewable, by way of a motion to alter or amend that order.

The § 636(c) referral gave the Magistrate Judge authority to enter a final judgment on the motions to dismiss "without district court review," and "to be treated as a final

14

judgment of the district court." *Roell*, 538 U.S. at 585; 28 U.S.C. § 636(c)(3). The referral statute previously contained a provision allowing parties to agree that appeal should be taken to the district court. 28 U.S.C. § 636(c)(4) (West 1996) (repealed Pub. L. 104-317, § 207 (Oct. 19, 1996)). But, Congress eliminated this option in the Federal Courts Improvement Act of 1996. "As a result of that legislation, an appeal from an order or judgment entered by a magistrate judge under § 636(c)(1) is now appealable *only* to a court of appeals." *Darnell v. Rossen*, 116 F.3d 187, 188 (6th Cir. 1997). Accordingly, the District Court is prohibited from reviewing a final order entered by a magistrate judge pursuant to a section 636(c) referral.

However, the prohibition against District Court appellate review does not necessarily preclude a district court from employing other forms of review. If a final judgment entered by a Magistrate Judge pursuant to a § 636(c) referral is supposed to be treated like a final judgment by the district court, then that judgment must be reviewable pursuant to a Rule 59(e) motion to the same extent that a judgment entered by the district court would be reviewable upon such a motion. Thus, the Court will not review the Magistrate Judge's final judgment *de novo*, but will elect to review it pursuant to the Rule 59(e) standards, altering the judgment only to the extent that it is subject to alteration under the parameters of Rule 59(e).

"A court may grant a motion to alter or amend judgment only if there was '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *ACLU of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 450 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). The grant or denial of a Rule 59(e) motion "is within the informed discretion of the

district court." *Gen. Corp, Inc., v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999); *see also Leisure Caviar v. United States Fish and Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) ("A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion.").

### C.    The Court's Prior Order

In his prior Order, Magistrate Judge Ingram dismissed Plaintiffs' RICO claims (Counts 2, 3, and 4) with prejudice for failure to state a claim upon which relief can be granted.  (Doc. # 170 at 24).  Specifically, he found that Plaintiffs failed to plead a "pattern" of racketeering activity as required for a claim under 18 U.S.C. § 1962(c), failed to allege an "acquisition injury" as required under § 1962(b), and consequently, failed to state a claim for conspiracy under § 1962(d).  *Id.* at 7, 23, and 24.  Next, the Magistrate Judge considered Plaintiffs' and Intervenor Plaintiffs' request for a declaratory judgment.  *Id.* at 25.  After weighing the "*Grand* Trunk" factors, the Magistrate Judge declined to exercise jurisdiction and dismissed Plaintiffs' Count One and Intervenor Plaintiffs' Complaint without prejudice.  *Id.* at 26-27 (citing *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)).  Finally, the Magistrate Judge erroneously found that subject-matter jurisdiction was satisfied "solely on account of federal questions arising under 18 U.S.C. § 1961," and consequently determined that he could decline to exercise supplemental jurisdiction over the remaining state law claims.  *Id.* at 24.  Thus, the Magistrate Judge dismissed Plaintiffs' state law claims (Counts 5-10) without prejudice.  *Id.* at 27.

Now, Plaintiffs claim that they are entitled to relief from the Magistrate Judge's Order granting Defendants' Motions to Dismiss with respect to all counts.  Defendants also seek

reconsideration, but only with respect to those claims dismissed without prejudice, arguing that the claims should be dismissed *with* prejudice.

### D.    RICO Claims

Plaintiffs brought claims under three sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO"): 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d).  The Magistrate Judge dismissed each of Plaintiffs' RICO claims with prejudice for failure to state a claim.  (Doc. # 170).  Plaintiffs claim that this dismissal was erroneous, and assert that the Court's Order contained two clear errors of law.[3]  First, they claim that the Court erred by dismissing RICO claims at the motion to dismiss stage, rather than allowing discovery. Next, Plaintiffs claim that the Court applied the wrong legal standard to the RICO elements of relatedness, open-ended continuity, and closed-ended continuity.  (Doc. # 174 at 11). According to Plaintiffs, had the Court applied the correct legal test, it would have found that Plaintiffs properly pleaded a "pattern" of racketeering activity.  The Court will address each of Plaintiffs' arguments in turn.

#### 1.    Dismissal was not premature

First, Plaintiffs claim that the Court's Order should be vacated on procedural grounds.  According to Plaintiffs, dismissal was premature because they should have been afforded an opportunity to develop their facts more fully through discovery.  (Doc. # 174 at 13).  But Plaintiffs do not explain how the Court's dismissal prior to discovery was clear

---

[3] The Court notes that much of Plaintiffs' motion to reconsider is merely a cloaked attempt to relitigate their RICO claims. This is inappropriate in a Rule 59(e) motion, and, given the circumstance, reeks of judge-shopping.  This Court will consider Plaintiffs' arguments only to the extent appropriate under the Rule 59(e) standard; that is, to the extent Plaintiffs' claim the prior order contains a clear error of law, or causes manifest injustice.  The merits of the claims otherwise finally adjudicated in the Court's prior order are properly on appeal to the Sixth Circuit.

error, nor how additional discovery would have cured their defective pleading.  In fact, the very facts that Plaintiffs claim were within the "exclusive knowledge of the defendants" involve the alleged frauds that the Court assumed were properly pleaded for purposes of its analysis.  (*See* Doc. # 174 at 12; Doc. # 170 at 7-10).  Additional discovery would not have altered the Court's analysis, and dismissal at the motion to dismiss stage was not clear error.   Accordingly, the Court will proceed to address Plaintiffs' substantive arguments.

### 2.    The Magistrate Judge did not make a clear error of law in finding that the SAC does not allege a "pattern" of racketeering activity

Plaintiffs claim that the Court erred in finding that the SAC does not allege a pattern of racketeering activity.  To establish a violation under § 1962(c), a plaintiff must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  "Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. 1961(1)(B)."  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).  To establish a "pattern of racketeering activity," a plaintiff must show, at a minimum, that the defendant committed two predicate acts within a ten year period.  18 U.S.C. § 1961(5).  Additionally, the plaintiff must demonstrate that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  In the Sixth Circuit, this is known as the "relationship plus continuity" test.  *Heinrich*, 668 F.3d at 409.  Both the relationship prong and the continuity prong must be satisfied to establish a pattern of racketeering activity.  *See id.*

18

### a.   The relatedness test in **Vild** *is still good law in the Sixth Circuit*

Plaintiffs first complain that the Court applied the wrong standard to the "relatedness" prong of the analysis.  Racketeering acts are related when they have "similar purpose, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240.

In its prior order, the Court found that the Dominion fraud was not sufficiently related to the frauds Defendants allegedly perpetrated against Plaintiffs and others.[4]  The Court relied in part on *Vild v. Visconsi*, in which dismissal was appropriate where the frauds alleged by plaintiff were "separate and unrelated" in purpose, had "disparate results," were "directed at different victims," and the methods of committing the schemes were different. (Doc. # 170 at 11-12) (citing *Vild*, 956 F.2d 560 (6th Cir. 1992)).  Similarly, the Court found that "the Dominion scheme and Peters's frauds against Plaintiffs have dissimilar purposes," "Dominion and Aces High are only similar to the extent that they are part of the coal industry," and that while "both schemes involve coal, their methodology is distinct."  *Id.* at 14-15.  Accordingly, the Court held that Plaintiffs could not rely on the Dominion fraud to establish a pattern of racketeering activity.  *Id.* at 16.

Plaintiffs allege that the Court committed clear error by applying the wrong legal test to its relatedness analysis.  According to Plaintiffs, *Vild* no longer controls, and instead

---

[4] In the Dominion scheme, the Peters Defendants diluted coal with "coke breeze" to cheat Dominion and "line their own pockets."  (Doc. # 170 at 14).  By contrast, in the schemes against Plaintiffs over two years later, the Peters Defendants failed to make promised payments, hired Plaintiffs to transport coal that was subject to a lien, and conspired with others to extort money from Plaintiffs through the demand letters, all with the purpose of repaying the loan from CB&T.  *Id.*

*Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995), is now the controlling case in the Sixth Circuit.  But contrary to Plaintiffs' assertion, *Vild* is still good law in the Sixth Circuit.  *Vild* has never been overturned,[5] and continues to be cited by the Sixth Circuit.  As recently as 2014, the Sixth Circuit cited *Vild* for the proposition that "a civil plaintiff may not use one type of conduct (acts directed at him) to satisfy the relationship test, and then invoke a second type of conduct (unrelated acts directed at others) to fulfill the continuity test absent similar types of conduct and victims who are essentially in the same position." *Kalitta Air, LLC v. GSBD & Assoc.*, 591 F. App'x 338, 346 n.5 (6th Cir. 2014) (quoting *Vild*, 956 F.2d at 570).  This is the exact proposition that the Court relied on to find that the Dominion fraud was not sufficiently related to the other frauds alleged in Plaintiffs' Complaint.  Thus, the Court did not commit a clear error of law by applying *Vild*'s relatedness test.

Moreover, *Columbia* does not contradict *Vild*, as Plaintiffs would have the Court believe.[6]  The court in *Columbia* used a multi-factor test to determine whether a pattern existed.  *Columbia*, 58 F.3d at 1110.  There, the Court reaffirmed a prior holding that "[i]n determining whether the predicate acts are sufficiently *continuous and related*," the greater the number of different schemes, predicate acts, types of injury, number of victims, and

---

[5] "Under the law-of-the-circuit doctrine, only the court sitting *en banc* may overrule published circuit precedent, absent an intervening Supreme Court decision or a change in the applicable law." *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004).  The Sixth Circuit has not conducted an *en banc* hearing to overturn *Vild*, and Plaintiffs point to no intervening Supreme Court decision or other change in the law that casts its authority into doubt.

[6] Even to the extent that *Columbia* could be read as being inconsistent with *Vild*, the Sixth Circuit has held that "when a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case."  *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (6th Cir. 2001).

number of perpetrators, the better. *Id.* (emphasis added) (citing *Fleischhauer v. Feltner*, 879 F.2d 1290, 1297 (6th Cir. 1989)). Plaintiffs conveniently ignore the fact that the *Columbia* test relates to "pattern" as a whole, not just "relatedness." Thus, while *Columbia*'s "the more the better" test may be useful in establishing a pattern over a period of time, it does not necessarily establish relatedness. To satisfy the "relationship plus continuity" test, the alleged acts must be ones with "similar purposes, results, participants, victims, or methods of commission ... and not isolated events." *H.J. Inc.*, 492 U.S. at 241. The Dominion fraud and the frauds against Plaintiffs are not sufficiently related under that standard.

### b.   Plaintiffs' allegations fail to establish a continuous pattern under Heinrich

Next, Plaintiff claims that the Court committed clear error in finding that Plaintiffs' allegations failed the continuity test. Continuity can be established either through a closed-ended pattern or an open-ended pattern. *Id.* at 241-42. A plaintiff can demonstrate a closed-ended pattern of criminal activity "by proving a series of related predicates extending over a substantial period of time." *Id.* Predicate acts that extend over only a few months are insufficient to establish a closed-ended pattern. *Id.*

The Court found that, disregarding the unrelated Dominion fraud, the activity Plaintiffs alleged was too brief to constitute a closed-ended pattern. (Doc. # 170 at 16). Plaintiffs claim that the Court erred by applying the "17 month rule" without considering any other factors. (Doc. # 174 at 14). However, the 17-month rule is sufficient to foreclose closed-ended continuity; the other factors bearing on continuity affect only the open-ended analysis. The Sixth Circuit has repeatedly held that activity lasting less than 17 months

21

does not meet the "substantial period of time" required to demonstrate a closed-ended pattern.  *See, e.g.*, *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *Heinrich*, 668 F.3d at 410.  Here, Defendants' alleged scheme spanned somewhere between ten and thirteen months, clearly falling short of the time period necessary to constitute a closed-ended pattern.  Thus, the Court did not commit clear legal error in finding that Plaintiffs failed to allege a closed-ended pattern.

Plaintiffs also claim that the Court erred in applying *Heinrich*'s open-ended continuity test.  (Doc. # 174 at 27).  An open-ended pattern can be proven by demonstrating "that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *Heinrich*, 668 F.3d at 410.  This can be accomplished "by showing that the related predicates themselves involve a distinct threat of long term racketeering activity, either implicit or explicit, or by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *H.J., Inc.*, 492 U.S. at 242).  In determining whether there is an open-ended pattern, a court examines the specific facts of the case and considers the totality of the circumstances surrounding the commission of the racketeering acts.  *Id.*  Subsequent events are irrelevant, because the threat of continuity is viewed "at the time the racketeering activity occurred."  *Heinrich*, 668 F.3d at 410 (citing *Busacca*, 936 F.2d at 238).

Plaintiffs claim that the Court committed a legal error by considering "subsequent events" in its continuity analysis.  (Doc. # 174 at 27).  Specifically, Plaintiffs claim that Defendants' conduct only ended because they "got caught," and that such an ending is irrelevant to the continuity determination.  *Id.* at 28.  However, Plaintiffs do not highlight a

point in the Court's analysis in which it considered *any* subsequent event, much less the fact that conduct ceased when Defendants were "caught." Having reviewed the prior Order, the Court is unable to find any part of the analysis that relies on this type of irrelevant fact. Rather, the Court's analysis is based only on the relevant activities as pleaded by Plaintiffs.

First, the Court found that the Complaint did not establish a distinct threat of long-term racketeering activity because "the alleged racketeering acts were driven by the need to satisfy the loan [from CB&T]" and "had the loan been satisfied, the racketeering activity would have ceased." (Doc. # 170 at 18). Defendants' satisfying the loan was not a "subsequent event" (it did not even occur), but instead, a "built-in ending point." *See Heinrich*, 668 F.3d at 410. Thus, the alleged scheme did not "include a specific threat of repetition extending indefinitely into the future." *Kalitta Air*, 591, F. App'x at 344. Next, the Court found that the SAC failed to establish that racketeering was part of "an ongoing entity's regular way of doing business." (Doc. # 170 at 18). The SAC stated that Plaintiffs and the Peters Defendants had "engaged in a large volume of business that was untainted by the fraudulent scheme," and made "no accusation that Bank Defendants ha[d] perpetrated any frauds unconnected to the Taylor Rose loan." *Id.* (internal citations and quotations omitted). Accordingly, the Court found that Plaintiffs did not allege that Defendants' activity was their "regular way of doing business." *Id.* Thus, the Court correctly found, without considering "subsequent events," that Plaintiffs did not allege open-ended continuity. Because Plaintiffs' allegations failed to meet the "relationship plus continuity" test, Plaintiffs failed to plead pattern of racketeering activity. Accordingly, the

Court did not commit a clear error of law in dismissing Plaintiffs' § 1962(c) claims with prejudice.

### 3.    Plaintiffs' § 1962(b) and § 1962(d) claims were properly dismissed

In their Motion to alter or amend, Plaintiffs do not raise any arguments with respect to the dismissal of their 1962(b) claims.  In its prior order, the Court correctly noted that Plaintiffs "have not attempted to argue any 'injury from the defendant's acquisition or control of an interest in a RICO enterprise, *in addition to injury from the predicate acts*,'" as required for a claim under 1962(b).  (Doc. # 170 at 23) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1190 (3d Cir. 1993)).  Plaintiffs do not argue that the Court committed clear error in reaching this conclusion.  Additionally, because Plaintiffs' § 1962(b) and § 1962(c) claims were properly dismissed, their § 1962(d) claim was also properly dismissed. *See Heinrich*, 668 F.3d at 411 ("To plausibly state a claim for a violation of 18 U.S.C. 1962(d), plaintiffs must successfully allege all the elements of a RICO violation," as well as an agreement).  Therefore, Plaintiffs' Motion to Alter or Amend the judgment is **denied with respect to the RICO claims**.

### E.    Declaratory Judgment

Both Plaintiffs and Intervening Plaintiffs seek a declaratory judgment clarifying the rights and responsibilities of the parties with respect to the Eagle Coal Sales deal. Specifically, Plaintiffs and Intervening Plaintiffs seek a declaration that their actions were "legal and proper in all respects."  (Doc. # 111 at ¶ 250). In its prior order, the Court declined to exercise jurisdiction over the declaratory judgment actions.  Now, Plaintiffs seek to have the Court amend its decision, and reinstate the declaratory judgment action.

Specifically, Plaintiffs assert that the declaratory judgment action should be reinstated because it was "properly pled," "is not being raised as an independent basis for federal jurisdiction," and "compelling a separate state court action ... would be a waste of judicial and party resources." (Doc. # 174 at 10). Plaintiffs do not assert, and the Court fails to see, any grounds to alter or amend the prior decision under Rule 59(e).

In its prior order, the Court considered its discretion to hear the declaratory judgment actions. The Declaratory Judgment Act affords "unique and substantial discretion" in deciding whether to provide declaratory relief. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Therefore, federal courts are "under no compulsion to exercise jurisdiction." *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942). The Sixth Circuit has identified five factors, known as the *Grand Trunk* factors, for district courts to consider when deciding whether to exercise jurisdiction under Section 2201:

> (1)   whether the declaratory action would settle the controversy;
>
> (2)   whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
>
> (3)   whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for *res judicata*;
>
> (4)   whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and
>
> (5)   whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008).

The Court considered these factors in its prior decision, and found that they weighed against exercising jurisdiction:

> Factor five favors dismissal because Plaintiffs could bring their declaratory judgment action in another nearby venue, such as Kentucky or West Virginia state court.  For example, this Court has previously found that Kentucky law generally "provides an alternative remedy to declaratory judgment in federal court."  *Grange Mut. Cas. Co. V. Safeco Ins. Co. Of Am.*, 565 F. Supp. 2d 779, 790 (E.D. Ky. 2008); *see also Jordan Ice Co. V. Grange Mut. Cas. Co.*, No. 0:06-CV-142-DLB, 2006 WL 3497767, at *5 (E.D. Ky. Dec. 4, 2006) ("Kentucky does provide an adequate procedure for a declaration of rights action.").
>
> Factor three also weighs in favor of dismissal.  This lawsuit arose in response to a threatened lawsuit against Plaintiffs by CB&T.  Issuing a declaratory judgment now would give Plaintiffs and/or Intervenors a procedural trump card, should CB&T file suit.  *See* D.E. 144 at 2 ("[We] filed this declaratory judgment action [because we will] likely be named as a party in a future subsequent action by CB[&]T.").

(Doc. # 170 at 26-27).  Accordingly, the Court dismissed the declaratory judgment actions without prejudice.  The Magistrate Judge reaffirmed his decision in the R&R on the motions to alter or amend.   Because the Court did not commit clear legal error, and Plaintiffs have not asserted that there is new evidence, a change in the law, or a need to prevent manifest injustice, there is no basis to alter the Court's original judgment dismissing this claim.  Thus, Plaintiffs' and Intervening Plaintiffs' motion to alter or amend is **denied** with respect to this claim, and the Court's prior judgment remains in effect.

### F.    State Law Claims

#### 1.    Motion to Alter or Amend granted

Finally, Plaintiffs and Defendants move to alter or amend the Court's prior judgment with respect to the state law claims.  In its prior Order, the Court dismissed Plaintiffs' state law claims without prejudice, finding that because it dismissed the only claims over which it believed it had original jurisdiction – the RICO claims – it could decline to exercise supplemental jurisdiction.  (Doc. # 170 at 24).  Plaintiffs and Defendants move to alter or

amend the Court's prior Order with respect to dismissal of the "supplemental" claims, asserting that the Court did, in fact, have original jurisdiction over those claims.  The Court agrees.

In its previous Order, the Court erroneously assumed that diversity jurisdiction did not exist.  Plaintiffs properly pleaded that jurisdiction was appropriate pursuant to 28 U.S.C. § 1332(a), "as the controversy is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000."  (Doc. # 111 at ¶ 19).  Indeed, Plaintiffs Aces High and Elza are citizens of Kentucky, the Bank Defendants are citizens of Georgia, the Peters Defendants are citizens of North Carolina, the Tomlin Defendants are citizens of Georgia, and the Troutman Sanders Defendants are citizens of Georgia.  *Id.* at ¶¶ 4-17.  The Court erred by dismissing the state law claims without prejudice for lack of original jurisdiction.  Therefore, Plaintiffs' and Defendants' Motions to Alter or Amend (Docs. # 173 and 174) will be **granted** with respect to the portion of the Order dismissing those claims.

Accordingly, the state law claims will be reinstated, and the Defendants' original motions to dismiss those claims will be reviewed by this Court *de novo*.  Because the state law claims were erroneously dismissed without prejudice in the Court's prior order, they were never reviewed on the merits by the Magistrate Judge.  Therefore, when this Court reviews those claims, it will not be reviewing a final judgment entered pursuant to a § 636(c) referral; rather those claims are presently before the Court for substantive review for the first time.

### 2.    Choice of Law

Federal courts sitting in diversity apply federal procedural law.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  The substantive law of the forum state governs the claims asserted.  *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993); *Moore v. Coffey*, 992 F.2d 1439 (6th Cir. 1993).  Accordingly, the Court will evaluate remaining state law claims in the Motions to Dismiss in accordance with the Federal Rules of Civil Procedure and will apply state law to the substantive claims.

Because multiple states are involved in this action, it may be necessary for the Court to engage in a choice of law analysis.  When conducting a choice of law analysis, federal courts apply the conflict of laws principles of the forum.  *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  In Kentucky, the analysis differs depending on the type of claim.

Most of Plaintiffs' claims are tort claims.  In tort actions, Kentucky applies the "significant contacts" test.  *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972).  This test requires courts to apply Kentucky law "if there are significant contacts–not necessarily the most significant contacts–with Kentucky."  *Id.* (also noting Kentucky's "egocentric" approach to choice of law questions); *see also Harris Corp.*, 712 F.2d at 1071 ("Kentucky courts ... appl[y] Kentucky law whenever possible.").  The tort claims alleged here were committed against Kentucky residents, which gives the claims "significant contacts" with Kentucky.  Accordingly, the Court will apply Kentucky law to Plaintiffs' claims for libel, tortious interference, fraud, and civil conspiracy.

28

### 3.    Standard of Review

When a defendant brings a Rule 12(b)(2) motion to challenge personal jurisdiction, the burden is on the plaintiff to establish personal jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  The plaintiff cannot meet his burden by simply pointing to the pleadings, "but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.*  A court views the pleadings in the light most favorable to the plaintiff and "does not weigh the controverting assertions of the party seeking dismissal." *Id.* at 1459.  When the court has not conducted an evidentiary hearing, a plaintiff need only make a *prima facie* showing of personal jurisdiction, *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002), making his burden "relatively slight." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008).

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its fact." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plausibility standard is met when the facts in the complaint allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The complaint need not contain "detailed factual allegations," but must contain more than mere "labels and conclusions." *Id.*  Put another way, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### 4.    Personal jurisdiction over Troutman Sanders Defendants

The Troutman Sanders Defendants, citizens of Georgia, argue that they are not subject to personal jurisdiction in Kentucky.  (Doc. # 117-1).  "A federal court sitting in

29

diversity may exercise personal jurisdiction over an out-of-state defendant only to the extent that a court of the forum state could do so." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 148 (6th Cir. 1997). In Kentucky, the issue of long-arm jurisdiction is governed by a two-step process. First, review must proceed under KY. REV. STAT. ANN. § 454.210 to determine if the cause of action arises from conduct or activity of the defendant that fits into one of the statute's enumerated categories. If not, then *in personam* jurisdiction may not be exercised. When that initial step results in a determination that the statute is applicable, the court proceeds to the second step of analysis and determines if exercising personal jurisdiction over the non-resident defendant offends his federal due process rights. *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011).

With respect to step one, the nine subsections in KY. REV. STAT. ANN. § 454.210(2)(a) each describe a generic scenario in which a Kentucky court may exercise jurisdiction over a nonresident defendant. The statute also provides that "[w]hen jurisdiction over a person is based solely upon this section, only a claim arising from acts enumerated in this section may be asserted against him." KY. REV. STAT. ANN. § 454.210(2)(b). Thus, a Kentucky court may not exercise jurisdiction "simply because [the non-resident defendant] has engaged in conduct or activity that fits within one or more subsections of KY. REV. STAT. ANN. § 454.210(2)(a). The plaintiff must also show that his claim is one that *arises from* conduct or activities described in the subsection." *Caesars*, 336 S.W.3d at 55 (emphasis added).

Here, Plaintiffs assert that Kentucky may exercise jurisdiction over the Troutman Sanders Defendants pursuant to two of the provisions in the long-arm statute: "transacting business in this commonwealth" (KY. REV. STAT. ANN. § 454.210(2)(a)(1)), and "causing

tortious injury by an act or omission in this Commonwealth" (KY. REV. STAT. ANN. § 454.210(2)(a)(3)).  (Doc. # 139 at 26-32).  The Magistrate Judge found that the Troutman Sanders Defendants' actions do not fit into either category.  (Doc. # 198).  Plaintiff raises four specific objections to the R&R, arguing that the Magistrate Judge erroneously looked beyond Plaintiff's SAC, that the Troutman Sanders Defendants were transacting business in Kentucky, that the Troutman Sanders Defendants caused tortious injury by an act occurring in Kentucky, and that discovery should have been permitted on this issue.  (Doc. # 202 at 106-116).  Because Plaintiffs objected to the entirety of the Magistrate Judge's analysis in the R&R, the Court will conduct a *de novo* review.

Plaintiffs claim that the Troutman Sanders Defendants "transacted business" in Kentucky as used in the long-arm statute.  There is little case law interpreting the meaning of "transacting business" as used in KY. REV. STAT. ANN. § 454.210 following *Caesars*, but, "even before [*Caesars*] narrowed the scope of Kentucky's long arm statute, Kentucky courts have required a course of direct, affirmative actions within a forum that result in or solicit a business transaction."  *Modern Holdings, LLC v. Corning, Inc.*, No. 13-CV-405-GFVT, 2015 WL 1481443, at *6 (E.D. Ky. Mar. 31, 2015).  "Isolated actions are insufficient."  *Id.*

Courts construing the definition of "transacting business" have defined the terms using their plain meaning.  Black's Law Dictionary defines "transact" as "[t]o carry on or conduct (negotiations, business, etc.) to a conclusion."  *Bayou City Expl., Inc. v. Consumer Advocate Servs. Enters., LLC,* No. 1:14-CV-99-DJH, 2015 WL 4094259, at *3 (W.D. Ky. July 7, 2015).  In *Bayou City*, the court found that mere solicitation by telephone did not rise to the level of "transacting business."  *Id.*  Like the defendants in that case, the Troutman

31

Sanders Defendants have had only minor contact with Kentucky. But, unlike those defendants, the Troutman Sanders Defendants were not even soliciting business through their contact. Instead, the Troutman Sanders Defendants were making a legal demand.

In another case, the Kentucky Court of Appeals found that a defendant company was not "transacting business" where they had no certificate of authority to transact business in Kentucky, had never maintained an office, post office box, or telephone listing there, did not have employees or agents there, owned no property there, and no employees or agents ever physically entered Kentucky to negotiate contracts or solicit business. *Tube Turns Div. of Chemetron Corp. v. Patterson Co., Inc.*, 562 S.W.2d 99, 99-100 (Ky. Ct. App. 1978). Similarly, Plaintiffs have not alleged that the Troutman Sanders Defendants meet any of these factors. Thus, based on the sparse case law interpreting "transacting business," as well as the common-sense meaning of the term, the Troutman Sanders Defendants' act of mailing demand letters to individuals in Kentucky and making one telephone call to Kentucky do not meet the definition of "transacting business."

Alternatively, Plaintiffs claim that the Troutman Sanders Defendants are subject to jurisdiction in Kentucky because they caused "tortious injury by an act or omission in [the] Commonwealth." (Doc. # 139 at 28-29). Specifically, Plaintiffs claim that the Troutman Sanders Defendants' demand letters were defamatory, that the letters were "published" when third parties read them in Kentucky, and that because publication is an element of defamation, the tortious conduct occurred in Kentucky. *Id.* But, as the Magistrate Judge explained in the R&R, this does not amount to "acting" in Kentucky.

In *Pierce v. Serafin*, the Kentucky Court of Appeals considered whether KY. REV. STAT. ANN. § 454.210(2)(a)(3) conferred personal jurisdiction over a nonresident defendant

when their only connection with Kentucky was mailing an allegedly tortious letter from outside the forum. 787 S.W.2d 705, 706 (Ky. Ct. App. 1990). The Court concluded that the defendant *caused a consequence* in Kentucky, but that he did not *act* in Kentucky. *Id.* (emphasis added). In this way, courts consider the tortious act separate and apart from the tortious consequence. Like the tortious letter in *Pierce*, the demand letters allegedly caused injury upon publication within Kentucky. But, also like the defendant in *Pierce*, the Troutman Sanders Defendants acted wholly outside of the Commonwealth. Thus, while the tortious consequence may have occurred in Kentucky, the tortious act did not. Moreover, courts interpreting the Kentucky long-arm statute have found that the first action a defendant takes in committing a tort is the action that determines where he committed the tort. *See Crum v. Estate of Mayberry*, No. 14-CV-84-ART, 2014 WL 7012122, *5 (E.D. Ky. Dec. 11, 2014) (citing *Spectrum Scan, LLC v. AGM Cal.*, 519 F.Supp.2d 655, 659 (W.D. Ky. 2007)). The Troutman Sanders Defendants' first action was writing, and perhaps mailing, the demand letters. Because those actions did not occur in Kentucky, jurisdiction does not attach under section 454.210(2)(a)(3).[7]

Plaintiffs also contend that discovery should have been permitted on the issue of jurisdiction. (Doc. # 202 at 111). The Court disagrees. The SAC contained detailed allegations of the Troutman Sanders Defendants' conduct. Plaintiffs have not claimed that

---

[7] Plaintiffs do not argue that Kentucky could exercise jurisdiction over the Troutman Sanders Defendants pursuant to KY. REV. STAT. ANN. § 454.210(2)(a)(4) (causing tortious injury in the Commonwealth by an act outside the Commonwealth). Nevertheless, the Court notes that subsection (4) would not apply in this case. That provision applies only where a defendant "regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth[.]" *Id.* Plaintiffs have not alleged, and the pleadings do not suggest, that the Troutman Sanders Defendants could meet that definition.

discovery could shed light on any fact that would change the Court's analysis, and they do not raise any factual dispute with respect to where the Troutman Sanders Defendants' conduct occurred.  Thus, their blanket assertion that discovery should have been permitted is without merit.

Finally, Plaintiffs contend that the Magistrate Judge should have addressed the constitutional bounds of due process in the R&R.  (Doc. # 202 at 112).  This objection also fails.  A due process discussion is not necessary to the Court's conclusion because Kentucky's long-arm statute is narrower than federal due process.  Thus, "[c]laims based upon contacts, conduct, and activities which may not fairly be said to meet one of [the long-arm statute's] explicit categories must be held to be outside of the reach of the statute, regardless of whether federal due process might otherwise allow the assertion of *in personam* jurisdiction."  *Caesars*, 336 S.W.3d at 56.  Because the Troutman Sanders Defendants' are not subject to personal jurisdiction under Kentucky's long-arm statute, they are not subject to personal jurisdiction in Kentucky, regardless of whether jurisdiction may be permissible under federal due process.

In short, all of Plaintiffs' objections with respect to the jurisdictional analysis fail. Kentucky's long-arm statute does not reach the Troutman Sanders Defendants, because they did not transact business in Kentucky or cause tortious injury by acting in Kentucky. Therefore, this Court **adopts** the Magistrate Judge's recommendation that the Troutman Sanders Defendants are not subject to personal jurisdiction in Kentucky, and **all claims against the Troutman Sanders Defendants** – Troutman Sanders, LLP and Michael Johnson – are **dismissed** pursuant to Rule 12(b)(2).

### 5.     Libel per se and Tortious Interference

The Bank Defendants assert that Counts 5 (libel per se) and 6 (tortious interference) should be dismissed for failure to state a claim upon which relief can be granted.[8] Specifically, they argue that the demand letters that form the basis for those claims are protected by the judicial statements privilege as a matter of law.  (Doc. # 119-1 at 10).

In *General Electric*, the Sixth Circuit held that Kentucky would, in the proper case, apply the absolute privilege to communications made by a party preliminary to a seriously considered judicial proceeding.  *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1127 (6th Cir. 1990).  Since then, the Kentucky Supreme Court has affirmed that holding.  *See Stilger v. Flint*, 391 S.W.3d 751, 754 (Ky. 2013); *Morgan & Pottinger, Attorneys, P.S.C. v. Botts*, 348 S.W.3d 599, 602 (Ky. 2011).  A communication must meet two requirements in order to be absolutely privileged: (1) "the communication must have been made 'preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of a judicial proceeding,'" and (2) "the communication must be material, pertinent, and relevant to the judicial proceeding."  *Morgan*, 348 S.W.3d at 602 (quoting *Gen. Elec. Co.*, 916 F.2d at 1127 and *Smith v. Hodges*, 199 S.W.3d 185, 193 (Ky. Ct. App. 2005)).  A statement made preliminary to a judicial proceeding must "ha[ve] some relation to a proceeding that is contemplated in good faith and under serious consideration."  *Gen. Elec. Co.*, 916 F.2d at 1127 (internal citations and quotations omitted).  The question of whether

---

[8] The Troutman Sanders Defendants also make the alternative argument that, if they were subject to personal jurisdiction, the claims against them should be dismissed because they are based wholly on the demand letters, which are protected by an absolute privilege.  (Doc. # 117-1 at 30).

to apply judicial statements privilege is a matter of law to be decided by the court. *Morgan*, 348 S.W.3d at 601 (citing *Rogers v. Luttrell*, 144 S.W.3d 841, 844 (Ky. Ct. App. 2004)).

The absolute privilege "renders the speaker's motives and intent irrelevant in light of the public policy favoring freedom to speak freely and without fear of civil suit and financial hazard." *Gen. Elec.*, 916 F.2d at 1128-29. The privilege is broad, protecting even those statements claimed to be "false and alleged with malice." *Morgan*, 348 S.W.3d at 601. For example, it has been applied to cases alleging defamation, tortious interference with business relations, and fraud in the inducement. *See Halle v. Banner Indus. of N.E., Inc.*, 453 S.W.3d 179, 187 (Ky. Ct. App. 2014).

The Magistrate Judge recommended that absolute privilege should apply to the Demand Letters in this case. (Doc. # 198 at 9.) Plaintiffs object, raising many of the same arguments articulated in their response to Defendants' motions to dismiss. Plaintiffs' objections fit into three overarching categories: first, that judicial privilege cannot be decided as a matter of law; second, that there are factual questions surrounding the applicability of privilege; and third, that the privilege analysis differs based on whether the statements were made prior to litigation or during litigation. For the reasons that follow, each of Plaintiffs' objections lack merit.

First, Plaintiffs' assertion that the privilege determination should not be made as a matter of law is simply incorrect. "The question of whether a privilege applies is a matter of law for the court to decide." *Morgan*, 348 S.W.3d at 601 (citing *Rogers*, 144 S.W.3d at 844). Thus, Plaintiffs' first argument is without merit.

Next, Plaintiffs contend that privileged communications made pre-litigation and those made during litigation are subject to different analyses. This is misguided. Courts define

"judicial privilege" as a privilege encompassing those communications made "preliminary to, *or* in the institution of, *or* during the course of a judicial proceeding." *Halle*, 453 S.W.3d at 184 (emphasis added). Thus, when courts discuss "judicial privilege," their analysis is applicable to relevant communications made at any stage of a judicial proceeding.

Plaintiffs claim that there must be a difference in the analyses because pre-litigation statements are subject to the "good faith" requirement, but those made during the course of litigation are not. The reason for this distinction is obvious. A statement made during the course of litigation is, without a doubt, made during the course of a judicial proceeding. But, courts must use the "good faith" measure to determine if statements made preliminary to litigation were made when a party was, in "good faith," contemplating litigation. Once a court determines that a statement was part of a judicial proceeding, the remainder of the "judicial privilege" analysis is the same, whether the statement was made prior to or during that proceeding. Thus, the principles referenced in the R&R that are derived from cases involving communications made during litigation are equally applicable to a statement made preliminary to litigation.

Plaintiff specifically took issue with the Magistrate Judge's observations that the privilege should be applied liberally, and that it applies "whether it is alleged that [Defendants] knew the charges were false and even if brought in bad faith or with actual malice." (Doc. # 202 at 86, 96). Those principles were articulated in cases involving statements made during the course of litigation. *See Smith v. Hodges*, 199 S.W.3d 185, 194 (Ky. Ct. App. 2005); *Ohnemus v. Thompson*, 594 F. App'x 864 (6th Cir. 2014). Because the principles governing judicial privilege apply equally to statements made pre- and mid-litigation, the Magistrate Judge was correct to rely on them in his R&R. And,

37

consequently, Plaintiffs' argument that the Demand Letters are excluded from judicial privilege because the claims in the letters constituted libel *per se* falls flat on its face. The Demand Letters fall within the protection of judicial privilege even if they were defamatory as long as the parties were contemplating litigation.

Finally, Plaintiffs' assertion that factual questions exist regarding whether Defendants were actually contemplating litigation fails. Plaintiff claims that when Defendants sent the demand letters, they were not contemplating litigation in good faith. However, looking at the demand letters themselves, it seems clear that they were sent in anticipation of litigation. Even viewing all facts in the light most favorable to Plaintiffs, Plaintiffs' lengthy Complaint contains no information indicating that the letters were not sent in anticipation of litigation. The Court also fails to see, and Plaintiffs fail to explain, how discovery could elicit facts that change this determination. The letters sent to Plaintiffs explicitly state that "[i]f the Bank is forced to pursue formal legal action to recover what it is rightfully owed, the Bank will seek all available remedies, including without limitation, compensatory and punitive damages, pre-judgment interest, attorneys' fees and costs" (Doc. # 1-1), and the letters sent to downstream purchasers of the coal state that "[t]he Bank is prepared and willing to pursue all options available to protect its rights." (Doc. # 1-2). It is difficult to imagine how a party could more clearly express that it is contemplating litigation.

Moreover, as the Magistrate Judge notes in the R&R, Plaintiffs themselves admit that they interpreted the letter as a serious legal threat. (Doc. # 198 at 12). In their SAC, Plaintiffs seek to restrain and enjoin Defendants from "seeking to collect any debts purportedly owed them by the plaintiffs as related to the subject cannel coal." (Doc. # 111

at ¶ 250(b)).  If Plaintiffs did not believe that the letters represented a serious threat of litigation, their declaratory judgment claim would be meaningless, and perhaps even frivolous.  Accordingly, Plaintiffs' claim that factual questions exist surrounding whether the letters were sent in "good faith" anticipation of litigation must fail.

Because the Demand Letters were sent in good faith contemplation of a judicial proceeding, and the substance of the letters was directly relevant to that contemplated proceeding, they are protected by absolute judicial privilege.  Thus, the Court **adopts** the Magistrate Judge's recommendation that **all claims based solely on the Demand Letters** should be **dismissed**.  Therefore, Count Five (libel per se) is **dismissed as to all defendants**, and Count Six (tortious interference) is **dismissed as to all defendants**, because those claims are based exclusively on statements contained in the demand letters, which are privileged under the law.

### 6.    Fraud

Defendants claim that Plaintiffs' fraud claim, Count Seven, must be dismissed for failure to state a claim, because Plaintiffs do not allege damages.  A plaintiff bringing a fraud claim in federal court must satisfy both Rule 9(b)'s pleading standard and the applicable state law elements of fraud.

"[T]o satisfy Rule 9(b), a plaintiff must (1) specify the time, place, and content of the alleged misrepresentation, (2) identify the fraudulent scheme and the fraudulent intent of the defendant, and (3) describe the injury resulting from the fraud." *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 751 (6th Cir. 2014).  Similarly, in Kentucky, a fraud claim requires:

> (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation

39

was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).  Both Rule 9(b) and Kentucky law require an allegation of injury.  Here, Plaintiffs fail to allege that they have suffered an injury as a result of Defendants' fraud because, although they assert two separate theories of injury, neither is cognizable.

First, Plaintiffs claim that they have suffered damages of "at least" $1,424,084.40 based on debts owed to them by the Peters Defendants.  During oral argument before the Magistrate Judge, Plaintiffs asserted that they actually suffered $2.8 million in damages. They explained that "the first 1.4 [million dollars] was obtained from Aces High via fraud. And then a fraudulent misrepresentation was made that caused them to provide services worth another 1.4 [million dollars]."  (Doc. # 197 at 28-29).  But, according to the SAC, Plaintiffs entered into the Eagle Coal Sales deal as a means to forgive the Peters Defendants of their original $1.4 million debt.  Additionally, Plaintiffs admit that the Peters Defendants paid them the $1.4 million that they bargained for as part of the deal.  Thus, there are no remaining debts owed to Plaintiffs, and therefore, no injury.

Plaintiffs also assert that they were injured through the Eagle Coal Sales Deal due to CB&T's assertion of a lien on the coal.  According to Plaintiffs, the fact that they face the threat of litigation from CB&T amounts to damages.  However, these "damages" are speculative, as CB&T has not filed suit against Plaintiffs.[9]  Kentucky law precludes recovery

---

[9] The Court notes that although the demand letters CB&T and Troutman Sanders sent to Plaintiffs were related to a "proceeding that [was] contemplated in good faith and under serious consideration," the standard employed for the judicial privilege analysis is less stringent than the

for damages that are uncertain, contingent, and speculative. *Spencer v. Woods*, 282 S.W.2d 851, 852 (Ky. 1955). Thus, "an increased threat of an injury that may never materialize cannot satisfy the injury requirement[.]" *Holmes v. Countrywide Fin. Corp.*, No. 5:08-CV-205-R, 2012 WL 2873892, *6 (W.D. Ky. 2012) (citing *Spencer*, 282 S.W.2d at 852). As it stands in this case, Plaintiffs' injury has not materialized. The Court cannot create injury by imposing liability that does not yet exist, and in fact, may never exist. Thus, Plaintiffs have failed to allege damages. And fraud without damage is not actionable. *Curd v. Bethell*, 58 S.W.2d 261, 263 (Ky. 1932); *Godley v. Piedmont Land Sales, Inc.*, 505 F. Supp. 397, 402 (E.D. Ky. 1978). Accordingly, Plaintiffs' **fraud claims** against the Peters Defendants and Tomlin Defendants in Count 6 must be **dismissed**.

### 7.    Civil Conspiracy

To prevail on a civil conspiracy claim, a plaintiff must prove "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)). This requires the plaintiff to show "that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act." *Peoples Bank of N. Ky. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008). A civil conspiracy claim is one "for damages caused by acts committed pursuant to a formed conspiracy." *Id.*

---

standard here. Judicial privilege does not require that the contemplated litigation be imminent. However, to properly plead claim for fraud, a plaintiff must allege an injury that more than just contemplated; it must actually materialize.

Civil conspiracy is not a free-standing claim in Kentucky: "[I]t merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 458-59 (6th Cir. 2013) (quoting *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, Nos. 2008-CA-002389-MR, 2009-CA-000026-MR, 2010 WL 2696278, *13 (Ky. Ct. App. July 9, 2010)). Therefore, a civil conspiracy claim not based on a tort cannot survive as a matter of law. *Flint v. Coach House, Inc.*, No. 2012-CA-000580, 2013 WL 869649, *4 (Ky. Ct. App. March 8, 2013) (holding that because the plaintiff had not stated a tort claim, "a cause of action for civil conspiracy cannot lie as a matter of law"); *Stonestreet Farm*, 2010 WL 2696278, at *14 ("Stonestreet's claim of civil conspiracy thus has no tort to be based upon and cannot survive as a matter of law."). Thus, because all of Plaintiffs' underlying tort claims have been dismissed, the **civil conspiracy claim** must also be **dismissed**.

### 8. Unjust Enrichment

Under Kentucky law,[10] "[t]he equitable doctrine of unjust enrichment is applicable as a basis for restitution to prevent one person from keeping money or benefits belonging to another." *Rose v. Ackerson*, 374 S.W.3d 339, 343 (Ky. Ct. App. 2012) (internal quotations omitted). Accordingly, a party must prove three elements to prevail on an unjust

---

[10] Kentucky courts have described unjust enrichment as a "quasi-contract claim." *See Jim Huff Realty, Inc. v. Tomlin Prop., Ltd.*, Nos. 2005-CA-002245-MR, 2005-CA-002379-MR, 2007 WL 1452596, at *3 (Ky. Ct. App. May 18, 2007). Under Kentucky law, contract claims are governed by the laws of the state with the most significant relationship to the transaction and parties. *Lewis v. Am. Family Ins. Grp.*, 555 S.W.2d 579, 581 (Ky. 1977). In this case, Kentucky law could apply, since the aggrieved Plaintiffs are Kentucky citizens, or Georgia law could apply, since CB&T was enriched through a contract executed in Georgia. However, because there is no conflict between Georgia law and Kentucky law, there is no need for the Court to conduct a choice of law analysis with respect to this claim. *See Asher v. Unarco Material Handling, Inc.*, 737 F.Supp.2d 662 (E.D. Ky. 2010).

enrichment claim: (1) a benefit was conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value.[11]  *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009).

Plaintiffs allege that "CB&T fraudulently obtained funds from Aces High, which were directly deposited into a Taylor Rose Account at CB&T.  Said fraudulently obtained monies were used by the Peters Defendants for partial payment of the Loan and, thus, CB&T was unjustly enriched thereby."  (Doc. # 111 at ¶¶ 282-83).  Plaintiffs do not explain how CB&T acted fraudulently; rather, they assert that the Peters Defendants acted fraudulently, and that CB&T realized a benefit from that fraud.  *See id.*  Thus, it would seem that it was the Peters Defendants, not CB&T, who were unjustly enriched.  But, even if CB&T was unjustly enriched when the Peters Defendants applied the funds from Aces High against their loan from CB&T, Plaintiffs' claim fails.  As discussed above, Plaintiffs recovered the money owed to them by the Peters Defendants as part of the Eagle Coal Sales deal.  (*See* Doc. # 111 at ¶ 124).  Therefore, CB&T's retention of the funds cannot be inequitable, because no benefit was conferred on them at Plaintiffs' expense.  Accordingly, Count Eight is **dismissed**.

In Count Nine, Plaintiffs ask the Court to impose a constructive trust on "all funds received by CB&T derived from frauds committed by other defendants against plaintiffs[.]"  *Id.* at ¶ 291.  A constructive trust is not a claim in and of itself, but a remedy for unjust enrichment.  *See Francis v. Nami Res. Co., LLC*, No. 04-CV-510, 2008 WL 852047, at *17

---

[11]  Similarly, to prevail on a claim for unjust enrichment in Georgia, a plaintiff must prove "(1) that it conferred a benefit on the defendant and (2) that equity requires the defendant to compensate for that benefit."  *Brooks v. Branch Banking & Trust Co.*, 107 F.Supp.3d 1290, 1298 (N.D. Ga. 2015).

(E.D. Ky. Mar. 28, 2008) (citing *In re Omegas Grp., Inc.*, 16 F.3d 1443, 1449 (6th Cir. 1994)). Thus, because Plaintiffs' unjust enrichment claim must be dismissed, **Plaintiffs' request for a constructive trust** must also be dismissed.

### G.     Plaintiffs' Motion for Sanctions

Plaintiffs have moved for sanctions against the Bank Defendants in relation to the Bank Defendants' Motion for Magistrate Judge Ingram to enter a final order (Doc. # 199).[12] (Doc. # 214). The Motion has been fully briefed and is now ripe for review. (*See* Docs. # 215 and 220). For the reasons explained herein, Plaintiffs' preposterous motion will be denied.

"In this circuit, the test for imposition of Rule 11 sanctions is whether the attorney's conduct was reasonable under the circumstances." *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997). As detailed above, this case has been subject to multiple referrals. One such referral was made pursuant to 28 U.S.C. § 636(c), granting the Magistrate Judge authority to enter a final order on the defendants' motions to dismiss. (Doc. # 160). The Magistrate Judge entered a final order granting the defendants' motions. (Doc. # 170). When the parties moved to alter or amend the Magistrate Judge's Order, a legitimate question arose as to which judge should address those motions – the Magistrate Judge, or the undersigned. The Bank Defendants' Motion was an attempt to resolve that

---

[12] The Clerk initially included a note on the Court's electronic docket sheet indicating that Docket Entry # 199 was referred to Magistrate Judge Ingram. Plaintiffs complained to the Clerk, and requested that the motion be referred to the undersigned. The Clerk corrected the entry accordingly. *See* 6:15-CV-161-DLB (Clerk's Note entered on 06/12/2017 therein). Thereafter, the Bank Defendants complained that the motion should have been referred to the Magistrate Judge. The Court notes that the Clerk's noted referral does not control which chambers is responsible for handling pending matters, and thus, the entirety of this petty exchange was completely unnecessary.

question. Although the Court has concluded that the motions to alter or amend are properly before the undersigned, the Bank Defendants' arguments to the contrary were reasonable under the circumstances surrounding this litigation.   Therefore, Plaintiffs' Motion for Sanctions is **denied**

## V.    Conclusion

Accordingly, for the reasons contained herein,

**IT IS ORDERED** as follows:

(1)    Plaintiffs' Motion to Alter or Amend (Doc. # 174) is **granted in part and denied in part**.  It is **granted** with respect to the state law claims (Counts 5-10), and **denied** with respect to the RICO claims (Counts 2, 3, and 4) and Declaratory Judgment action (Count 1);

(2)    The Bank Defendants' Motion to Alter or Amend (Doc. # 173) is **granted**, and the following claims are reinstated: Count 5 (libel), Count 6 (tortious interference), Count 7 (fraud), Count 8 (unjust enrichment), Count 9 (constructive trust), and Count 10 (civil conspiracy);

(3)    The Troutman Sanders Defendants' Motion to Dismiss (Doc. # 116) is **granted**, and all claims against them (Counts 5, 6, and 10) are **dismissed with prejudice** pursuant to Rule 12(b)(2);

(4)    The Tomlin Defendants' Motion to Dismiss (Doc. # 118) is **granted**, and the claims against them in Counts 7 and 10 are **dismissed with prejudice** pursuant to Rule 12(b)(6);

(5)    The Bank Defendants' Motion to Dismiss (Doc. # 119) is **granted**, and the claims against them in Counts 5, 6, 8, 9, and 10 are **dismissed with prejudice** pursuant to Rule 12(b)(6);

(6)    The Peters Defendants' Motion to Dismiss (Doc. # 121) is **granted**, and the claims against them in Counts 7 and 10 are **dismissed with prejudice** pursuant to Rule 12(b)(6);

(7)    Plaintiffs' Motion for Sanctions (Doc. # 214) is **denied**;

(8)    This matter is hereby stricken from the Court's active docket; and

(9)    A separate judgment will be entered contemporaneously herewith.

This 21st day of July, 2017.

Signed By:

*David L. Bunning*    *DB*

United States District Judge

K:\DATA\ORDERS\London\2015\15-161 Aces High MOO.wpd